Major C. TODD, Jr., Surviving Partner, and Major C. Todd, Jr., and Ira T. Todd, Jr., Co-Administrators of the Estate of Ira T. Todd, Deceased Partner of the Partnership Formerly Trading as Todd Brothers

v.

UNITED STATES.

Cong. No. 16–54.

United States Court of Claims.
July 19, 1961.

Harry E. Wood, Washington, D. C., for plaintiffs. Emery & Wood, Washington, D. C., were on the briefs.

Philip W. Lowry, Washington, D. C., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant.

PER CURIAM.

This is a congressional reference case before the court pursuant to Senate Resolution 308, 83d Cong. 2d Sess., which resolution referred to the court S. 749 for a report sufficient to inform the Congress of the nature and character of plaintiffs' claims as provided by 28 U.S.C. 1492 and 2509 and Rule 14 of this court, 28 U.S.C.

The case was referred pursuant to Rule 45 to Marion T. Bennett, a trial commissioner of this court with directions to make findings of fact and recommendations as to the nature of plaintiffs' claims. The commissioner has done so in a report filed July 21, 1960. Briefs and exceptions were filed by both parties, and the case was submitted to the court on oral argument by counsel. Since after full consideration of the record, the court is in agreement with the findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its recommendation to the Congress. It is therefore concluded and reported to the Congress that plaintiffs have an equitable but not legal claim against the United States in the amount of $23,240. See opinion of this date in the companion case of G. W. Todd, et al., Cong. No. 17–54.

The clerk will certify to the Congress pursuant to S.Res. 308, 83d Cong., 2d Sess., this opinion, together with the opinion of the trial commissioner and the findings of fact which follow.

It is so ordered.

Opinion of the Commissioner

This is a congressional reference case before the court pursuant to sections 1492 and 2509, title 28, United States Code, and to Senate Resolution 308, 83d Congress, 2d Session, referring to the court S. 749 for a report sufficient to inform Congress of the nature and character of the plaintiffs' demand as a claim, legal or equitable, against the United States, and the amount if any, legally or equitably due from the defendant to the claimants. The Todd Brothers, sometimes hereinafter referred to as the plaintiffs, claim $6,800 as the fair and reasonable depreciated value of their fishing nets, poles and equipment and $45,000 as the value of their property rights in certain fishing locations off Cedar Point, Maryland, in the Chesapeake Bay, the same allegedly having been taken by defendant without just compensation under the fifth amendment to the Constitution. The suit is brought by Major C. Todd, partner of Ira T. Todd, deceased, the latter represented here by Major and by Ira T. Todd, Jr., coadministrators.

The partner plaintiffs, residents of Crisfield, Maryland, for many years prior to 1941, conducted commercial pound-net fishing operations for shad and herring off the western shore of Maryland. In 1940 and 1941 they fished five nets in the Chesapeake Bay above Cove Point at or near Flag Point or Governor's Run and five nets below Cedar Point. In 1941 Maryland adopted certain conservation

measures restricting pound-net fishing (2 Annotated Code of Maryland, 1951, Art. 66C). Thereafter, it was necessary to have a license. Plaintiffs secured such licenses for their 10 nets. They were renewed through 1950 with modifications. These licenses could, as a matter of right, be renewed annually. They were for specific locations indicated in the original application, and these locations were a matter of record in the offices of the Maryland Department of Tidewater Fisheries. From the time of enactment of the State statute the holders of licenses had a property right in the fishing grounds where they were licensed to fish and such right could be sold, pass by inheritance to the next of kin of a deceased owner, or be left to others by will. The statutes are set forth in the findings.

On July 6, 1943, and December 14, 1943, the Secretary of War issued danger zone regulations governing navigation in waters of the Chesapeake Bay between Cedar Point, Maryland, and Smith Point, Virginia. These regulations established restricted and prohibited areas for military purposes arising out of the activities of the Patuxent Naval Air Station. From and after December 14, 1943, plaintiffs were prevented by defendant from operating their nets in their licensed locations below Cedar Point in a normal and profitable manner. In 1944 they were permitted under severe restrictions to fish two of their nets below Cedar Point, but it was not a successful operation because of defendant's restrictions. Thereafter, all efforts to fish the five nets in this area were abandoned by plaintiffs. The restrictions not only reduced the number of nets plaintiffs could fish but limited the hours and made the operation inherently dangerous by reason of the location of the nets within gunnery ranges.

Plaintiffs were able to use one additional net and set of poles at their Flag Point location. The plaintiffs made no attempt to find other locations knowing that it would be futile, as their specially designed pound nets would not have been suitable for other locations which, in any event, were either unavailable since licensed to others or prohibited by policy of the State commission. The nets and poles were withdrawn from the water and rotted on the beach. Plaintiffs continued to fish above Cove Point and obtained a supplement to their income by working for the State, planting oyster shells.

An amendment to the danger zone regulations, effective April 19, 1949, while reducing the restricted area, did not help plaintiffs because their five nets below Cedar Point were still in an area where fishing structures, such as they had employed, were forbidden without defendant's prior written approval, and defendant's regulations made it clear it would not be responsible for any damage to such structures. By this time, however, plaintiffs had no nets and poles to use in these five licensed locations. They had deteriorated beyond use. Their replacement for operation under existing restrictions would have been impractical, even assuming it had been approved by defendant. Plaintiffs' use of five nets was effectively frustrated by defendant, and plaintiffs' property was rendered valueless thereby.

In its brief, defendant for the first time raised the defenses of the statute of limitations and of laches. These are affirmative defenses. Rule 15(b) of the court requires such defenses to be set forth affirmatively in the pleadings. Defendant has not done this. Assuming, however, that the court might at the time of argument allow the pleadings to be amended under rule 18(b) to conform to the proof, some observations are here offered as to these defenses.

The plaintiffs say that the effective date of the alleged taking was December 14, 1943, when the regulations of July 6, 1943, were amended, as set forth in finding 7, which prevented their successful fishing. The 1943 fishing season continued without interference of a serious nature until it ended on or about June 1, 1943. In the 1944 fishing season the plaintiffs' fishing was limited in the pro-

hibited area to the use of two of its nets there and by the end of that season on or about June 1, 1944, it was first clearly apparent that defendant had effectively frustrated plaintiffs' normal fishing operations below Cedar Point and made its licensed rights in all five locations there without real value.

The petition was filed November 10, 1954. The claim first accrued well beyond the 6-year period of limitation (28 U.S.C. § 2501). There is no evidence of any claim for payment prior to the filing of the petition unless it be the bill, S. 749, set forth in finding 2 and introduced on February 2, 1953, to confer jurisdiction on the court to hear and determine this claim and in effect waive the statute of limitations by requiring only that the claim must be filed in the court within 6 months after date of enactment of the act. S. 749 was not enacted, however. It was referred to the court by S.Res. 308 with directions to report as to the nature of the claim, legal or equitable, and the amount due, if any, to the claimants.

■■ The statute of limitations is jurisdictional. It cannot be waived except by act of Congress. It is the duty of the court to raise the question if it is not raised by the parties. In Empire Institute of Tailoring, Inc. v. United States, 161 F.Supp. 409, 410, 142 Ct.Cl. 165, it was said: "[The] court has consistently held that a claim first accrues on the date when all events have occurred which fix the liability, if any, of the United States and entitles the claimant to sue thereon. [Citing cases.]" The plaintiffs could have brought suit at any time within 6 years after June 1, 1944. Not having done so, I recommend that Congress be advised that plaintiffs have no good legal claim.

Plaintiffs say that in Jackson v. United States, 1952, 103 F.Supp. 1019, 122 Ct.Cl. 197, also a congressional reference case, the date of taking was February 24, 1943, and the petition was not filed until February 21, 1950; yet the court held that plaintiff had a good legal claim. The statute of limitations is not referred to in the pleadings, findings, or opinion in that case. I can only say, respectfully, that I would not have come to the same conclusion as to the right of legal recovery in Jackson.

Defendant says that the claim here is barred by laches, for the considerable delay in making the claim has been to the prejudice of defendant in loss of important evidence relevant to permissions granted plaintiffs to pound-net fish below Cedar Point and the capabilities and feasibility of plaintiffs fishing elsewhere in Chesapeake Bay. It is hard to understand how defendant can be excused from taking property on the grounds that the owner might obtain other property just as good elsewhere. In any event, evidence was offered on both of the ideas defendant now advances in support of laches.

Plaintiffs admit that they had no thought of a Court of Claims action until after the judgment in Jackson, supra. The filing of the claim was long delayed. In O'Brien v. United States, No. 146–58, decided January 20, 1960, the court said:

"Laches is an equitable defense, and in its operation it fulfills the same function as the statute of limitations at law. However, laches, unlike the statute of limitations, is a flexible concept based on fairness and applied in the discretion of the court. The cause of the delay, the hardship to the defendant, the nature of the relief, and other factors must all be considered in determining its application."

■ In applying the doctrine of laches the defendant must establish the defense in the usual manner and mere delay in asserting rights is not sufficient to establish such a defense. Henry v. United States, 153 F.Supp. 285, 139 Ct.Cl. 362. Admitting some lack of diligence by plaintiffs, I am not satisfied that defendant has shown prejudice by the delay sufficient to bar the action. Both elements are necessary to this defense. Levy v. United States, 118 Ct.Cl. 106. The delay, however, could be considered

sufficient to eliminate the allowance of interest as a part of just compensation.[1] Finally, defendant itself is late in asserting this defense. As the court said in Crocker v. United States, 127 F.Supp. 568, 573, 130 Ct.Cl. 567, 575:

" * * * This contention was raised for the first time in the defendant's brief. The rules of this court require that the defense of laches be pleaded as an affirmative defense. This defense was not contained in the defendant's answer and the defendant has presented no evidence to show that it had in any way been prejudiced by the delay of the plaintiff in filing this suit. Since laches is an affirmative defense, it must be pleaded or it is considered waived if it is not pleaded."

This is also the interpretation of the similar Federal Rule of Civil Procedure. Riley v. Titus, 89 U.S.App.D.C. 79, 190 F.2d 653.

■ Attention is now directed to whether defendant's actions in this case constituted an actual taking within the meaning of the fifth amendment prohibiting the taking of private property for public use without just compensation. The short answer to this is that the same question was answered in the affirmative by the court in Jackson v. United States, 103 F.Supp. 1019, 122 Ct.Cl. 197. In a letter of April 2, 1954, to the Chairman of the Senate Judiciary Committee, the Secretary of the Army, referring to the court's decision in Jackson and to S. 749 for the relief of plaintiffs, said, "The Department of the Army is of the opinion that the claimants under the subject bill should be compensated in a reasonable amount for the damages suffered as a result of the loss of the right to fish." That letter is a part of the file transmitted to the court by the Senate and is in the Senate report on the bill referred to the court.

The court said in Matthews, Trustee, v. United States, 87 Ct.Cl. 662, 714:

" * * * A taking of property within the meaning of the Constitution may be accomplished without formally divesting the owner of title to the property or of any interest therein. It is not material whether the property is removed from the possession of the owner, or in any respect changes hands; if it is of such a character and so situated that the exercise of the public use of it, as warranted by the statute, does, in its natural consequences, affect the property by taking it from the owner or depriving him of the possession or some beneficial enjoyment of it, then it is appropriated to public use by competent authority, and the owner is entitled to compensation. Constitutional rights rest on substance, not on form, and the liability to pay compensation ،for property taken is not avoided by leaving the title in the owner, while depriving him of the beneficial use of the property."

Defendant permanently deprived plaintiffs of property from which they earned their living and which they had the right to sell or devise. It had a value, and defendant is equitably, and but for the statute of limitations would legally be, required to pay for appropriating it. This was no mere frustration of a prospective business opportunity as in United States v. Grand River Dam Authority, 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186. It was the destruction of profitable property rights long existing. Defendant did not forbid use of the navigable waters under the commerce clause which would have relieved it from liability as indicated in the Jackson and Grand River Dam Authority opinions and cases cited there. True, the danger zone regulations were promulgated pursuant to a river

---

1. If the court should think interest is allowable as a part of just compensation, it should be on the value of two sets of poles and nets from December 14, 1943, and on two other sets of nets and poles from June 1, 1944, and on three-fifths of the value of the fishing rights between December 14, 1943, and June 1, 1944, and on the full value thereafter.

and harbor act, 40 Stat. 266, 33 U.S.C. § 1, but the object to be obtained was not in aid of commerce on navigable waters but rather the attainment of military purposes which restricted navigation and commerce. The Secretary's authority to issue regulations in the interest of national defense and protection of life and property on navigable waters is specifically restricted to such action as will not unreasonably interfere with the food fishing industry. 40 Stat. 892, 33 U.S.C. § 3. Defendant's actions here were an unreasonable interference.

Defendant undertakes to distinguish the Jackson case. Defendant says plaintiffs' property rights to fish were limited by the Maryland Tidewater Fisheries law requiring permission of the abutting riparian owner, in this case the United States. A careful reading of the statutes relied upon (2 Annotated Code of Maryland, 1951, Art. 66C, § 249 and 258) indicates that they are not pertinent since they refer to the tidal waters of the tributaries or rivers running into the Chesapeake Bay. Plaintiffs did not fish in the tributary waters.

■ Defendant further contends that in the instant case, as distinguished from Jackson, plaintiffs had made a binding agreement with the defendant and the Tidewater Fisheries authorities not to fish more than three pound nets below Cedar Point subsequent to 1943. Defendant is referring to a conference described in the findings which took place between the parties about the first of the year 1944, at which time defendant granted permission for plaintiffs to fish two of their five nets below Cedar Point under certain restrictions which among other things required the fishermen to get out of the restricted area where their nets were before 8 a. m. The defendant says that this so-called agreement was a waiver by plaintiffs of their right to fish five nets in the manner previously followed below Cedar Point. This is a harsh interpretation of what happened. There is nothing at all in the evidence to suggest that plaintiffs considered this anything but a temporary arrangement to make the best of a bad situation in which they had no other choice. Plaintiffs continued to have their licenses renewed, although they were unable to use them due to defendant's actions. The consequences of defendant's taking of plaintiffs' property rights granted by those licenses cannot be avoided by granting to plaintiffs permission to make limited use of those rights under conditions which proved altogether worthless.

What then is the value of the lost fishing rights of Todd Brothers? There is no evidence of market value for there were no sales. Plaintiffs' requested findings suggest $45,000.

In the Jackson case the court had evidence before it showing that the plaintiff's net annual income from the nets involved was an average of $2,050 for the 3 years immediately before the taking. Plaintiff was given a judgment of $10,000 described as in the nature of a "jury verdict." That is one-fourth of $40,000, which capitalized at 5 percent approximates plaintiff's annual net income in that case. However, this court did not make a judgment based on capitalization of earnings. Five times the plaintiff's average annual earnings in Jackson is closer to what was actually awarded.

In the instant case there is no evidence of actual earnings, either immediately before or after the taking, for the nets and locations in question. The only evidence about earnings is the testimony of one of the plaintiffs that the profit from the five nets below Cedar Point was about the same as for the five above Cove Point. For the latter, the earnings for several years after 1943 averaged just under $4,500 annually, but this may have included income from activities other than pound-net fishing. It is fairly obvious that the right to fish the other five nets here in issue had some value although there is no record of what income they produced. Plaintiffs had been fishing these net locations for many years. It must have been a profitable thing or plaintiffs would not have continued operations there nor would they have been ready, willing and able to do so in 1944

when effectively prevented from normal operations by defendant's intervention in their affairs. It must be remembered, too, that the partners fished the same number of nets and split their profits. It is inherently unlikely that the two fishing locations could have differed much under such an arrangement. Of course, the nets above Cove Point were many miles away. More herring than shad were caught there. Fishing is an inherently speculative enterprise. The widely fluctuating profits in evidence show that.

■ Accepting the results in the Jackson case as a formula and assuming comparable net profits from .plaintiffs' two net locations would place a valuation on the fishing rights here in the sum of $22,500. Absent the more substantial evidence of the Jackson case as to the direct earnings from the nets in question, and considering the doubt that plaintiffs' income, as shown by the evidence, was exclusively from the Flag Point nets, it is doubtful if the rights here are entitled to as high a proportionate valuation. A fair estimate, again in the nature of a jury verdict, is that plaintiffs' fishing rights below Cedar Point were worth not to exceed $20,000 at the time of their effective elimination by defendant.

To the foregoing sum must be added the depreciated value of four pound nets, $2,400, and of the poles for these nets, $840. Nothing is allowed for one net and one set of poles for which plaintiffs found use elsewhere.

■ The foregoing determination of just compensation for the taking of plaintiffs' property is, under the facts and circumstances of the case, necessarily in the nature of a jury verdict. That such a method of arriving at just compensation is appropriate in such cases in this court is so well established as not to require emphasis. "Where, for any reason, property has no market, resort must be had to other data to ascertain its value, * * * [this] involves the use of assumptions, which make it unlikely that the appraisal will reflect true value with

nicety." United States v. Miller, 317 U. S. 369, 374, 63 S.Ct. 276, 87 L.Ed. 336; American-Hawaiian Steamship Company v. United States, 124 F.Supp. 378, 381, 129 Ct.Cl. 365, 369. "The ascertainment of value is not controlled by rigid rules or artificial formulae; what is required is a 'reasonable judgment having its basis in a proper consideration of all relevant facts. [Simpson v. Shephard] Minnesota Rate Cases, 230 U.S. 352, 434 [33 S.Ct. 729, 57 L.Ed. 1511]'"; Western Contracting Corporation v. United States, Ct.Cl. No. 344–55, decided December 3, 1958.

It is concluded for the reasons stated in the opinion and upon the findings of fact that plaintiffs have an equitable but not a legal claim against the United States for $23,240 and it is recommended that this should be reported to the Senate of the United States, pursuant to S.Res. 308, 83d Congress, 2d Session.