Colaianni, Commissioner:
Concurring in the result.
I concur in the result reached by the review panel. However, the majority’s conclusion that the claim which forms the subject matter of this Congressional reference case is not barred by laches is, in my opinion, contrary to all established principles of appellate review. Such principles are intended to apply to a Congressional reference proceeding. See 28 U.S.C. § 2509 (c) and Appendix D of the Rules of this court.[13]
A careful reading of the trial transcript indicates that counsel for defendant, on the first day of trial, attempted to amend his answer to plead the affirmative defenses of limitations and laches. Claimants objected to such a belated motion. Because of the failure by defendant to raise such defenses in either its answer or at any of three pretrial conferences, the motion was denied by the trial commissioner. *845 No evidence dealing exclusively and solely with the question of laches was thus permitted. Neither side requested that the trial commissioner make findings of fact on the subject of laches. Further, no mention was made of laches in any of the post-trial briefs filed with the trial commissioner.
'Commissioner Schwartz’ October 31,1972, report and findings of fact correctly deals with the related jurisdictional question of limitations. The propriety, indeed the duty, of the commis'sioner dealing sua sponte with the question of limitations is mandated by the Congressional reference case of Todd v. United States, 155 Ct. Cl. 87, 93, 292 F. 2d 841, 844 (1961), declaring:
The statute of limitations is jurisdictional. It cannot be waived except by act of Congress. It is the duty of the court to raise the question if it is not raised by the parties.
Defendant, at p. 5 of its brief and exceptions to the commissioner’s report, sets forth the above events and then mistakenly contends:
The opinion of the Commissioner resuscitates this issue [defendant’s motion to amend the answer to include the defenses of statute of limitations and laches] however, and without discussing the laches issues disposes of the statute of limitations question as one of law. * * * defendant contends that plaintiffs’ claim is also barred by laches.
Claimants, at p. 4 of their reply brief, respond to defendant’s unjustified comment of laches as follows:
Defendant seizes on a mention in the Trial Commissioner’s opinion of the fact that the one-year limitation imposed by statute had expired, as reviving defendant’s belated and unsuccessful effort to amend its answer to interpose defenses of limitations and laches. These affirmative defenses were never mentioned by defendant until the day of trial, and the Trial Commissioner refused to allow these issues to he introduced at that stage. Defendant sought no review of this ruling, and has not made it the subject of an exception. It sought no findings on laches or limitations, and its effort now to revive these defenses as to which there was no opportunity for the presentation of evidence or argument is *846 contrary to principles of proper trial and appellate, procedure and tbe applicable rules.
The majority appears to be more concerned with what it terms a “belief that, in this Congressional reference, the House may * * * wish to be apprised of the Panel’s conclusions respecting [laches] * * *” than with claimants’ position that addressing the issue of laches for the first time at the review panel level would be contrary to all principles of proper trial and appellate procedure — principles, I take it, that all would agree are not to be consigned to oblivion simply because we are deliberating in the context of a Congressional reference rather than a suit at law. See, e.p., Eule 11, Appendix D, Eules of the U.S. Court of Claims.
The majority feels, in spite of the lack of opportunity by both sides to fully treat, at the trial level, such laches-related subjects as the cause of the claimants’ delay in bringing suit, the prejudice, if any, to defendant, etc., that the present record enables it to conclude that the claim cannot be barred by laches. With this I cannot agree. One can only speculate as to what additional evidence defendant might have introduced if the defense of laches had been timely and properly raised. The fact is defendant did not timely raise the defense and the trial commissioner properly denied defendant’s belated attempt to do so on the first day of trial. Further, the trial commissioner correctly made no findings of fact on the subject of laches, and, based on the record before us, I do not feel that the panel should either.
If the majority’s concern to fully apprise the House of defendant’s defense of laches is to be taken seriously, Eule 147 (b) authorizes the panel to remand the reference back to the trial commissioner to receive further evidence on the subject. To reach the conclusion, on the necessarily limited record that is presently before this panel, that the claim is not barred 'by laches not only may do a disservice to defendant, but may be substantively incorrect.
The puzzling aspect of the majority’s position is its recognition that a detailed discussion of the defense of laches was not necessary in order to resolve the issue involved in *847 this Congressional reference case. In my opinion the portion of this report that deals with the substantive aspects of defendant’s defense of laches is totally unnecessary, procedurally incorrect, and I do not join in it.
Finally, I am obliged to explain that I concur in the result because the proofs satisfy me that had the actions complained of by claimants been perpetrated by a private party, the claim asserted would have been redressable at law. Thus, I conclude that claimants have made out an “equitable claim” within the meaning of 28 U.S.C. § 2509(c).
FINDINGS OF FACT
1. H. Ees. 324, 91st Cong., 1st Sess., introduced March 17, 1969 and approved February 17, 1970, referred H.E. 8568, 91st Cong., 1st Sess., “A bill for the relief of Yiorica Anna Ghitescu, Alexander Ghitescu, and Serban George Ghitescu, together with all accompanying papers”, introduced March 10, 1969, to the Chief Commissioner of the Court of Claims pursuant to 28 U.S.C. §§ 1492 and 2509 (1970), “for further proceedings in accordance with applicable law.”
2. H.R. 8568, supra, reads in part as follows:
* * * the Secretary of the Treasury is authorized and directed to pay to Viorica Anna Ghitescu, Alexander Ghitescu, and Serban George Ghitescu, the heirs of Amadeu Ghitescu, out of the moneys deposited pursuant to the Agreement between the United States and Eu-mania signed at Washington March 30,1960, the amount of $133,737.14, as settlement in full of their claim arising out of the vesting of that amount representing money belonging to Amadeu Ghitescu.
3. H. Eep. No. 91-820, 91st Cong., 2d Sess., February 3, 1970, accompanying H. Ees. 324, contains a letter, dated September 17,1969, from the then Deputy Attorney General, setting out the facts of the matter and recommending against the enactment of H.E. 8568.
Subcommittee No. 2 of the House Committee on the Judiciary heard testimony on the bill on September 18 and October 16, 1969. Among the witnesses was Irving Jaffe, *848 Deputy Assistant Attorney General, Civil Division, Department of Justice, who presented the Deputy Attorney General’s letter and testified in supplementation of it.
4. Plaintiffs filed a petition with the Chief Commissioner July 20, 1970, and defendant filed its answer September 17, 1970.
Three pretrial conferences were held at which agreement was reached on a stipulation of facts and on the admission in evidence of a number of exhibits. The stipulation and exhibits form the basis for findings 5-29.
Among the pretrial agreements was a stipulation of Bu-manian law. Further provisions of Bumanian law were testified to at trial by experts in Bumanian law, one on behalf of each party.
Trial was held on November 12, 1971. Post-trial briefing by the parties was completed on May 17, 1972.
BINDINGS BASED ON PRETRIAL DATA

The Ghitescu Guaranty Accownt

5. In about 1931 in Bumania, Nicu Butculescu and Amadeu Ghitescu, citizens and residents of Bumania, formed a limited partnership without shares, also called a simple partnership, known as N. Butculescu Societe en Commandite. Each of the partners had a one-half interest in the partnership, according to an agreement between the parties limited to this proceeding. Mr. Butculescu was the general partner and Mr. Ghitescu a limited silent partner. At the subcommittee hearings on H.B. 8568 (finding 3) Mr. Jaffe described Mr. Ghitescu as a wealthy man who as the silent limited partner put up the capital. The partnership acted as the distributor in Bumania for the products of the Caterpillar Tractor Co., of Peoria, Illinois, and its main business was the importation of Caterpillar tractors and other products.
6. Assets of the partnership in Bumania, if any, are not involved in this proceeding. The asset of concern here is an account at Caterpillar Tractor Co. known as the “A. Ghitescu Special Guaranty Account,” that is, a debt owed by Cater *849 pillar to the owner of the account in the amount from time to time standing to the credit of the account.
7. The account originated in a request in 1934 from Caterpillar for a cash deposit to guarantee future shipments to the partnership. In response to the request, Mr. Ghitescu sent $100,000 from his own funds to Caterpillar for deposit in a guaranty account.
8. The title of the account is variously described in the stipulation of facts as the “A. Ghitescu Special Guaranty Account” and the “A. Ghitescu guarantee account.” It is found that the title of the account is “A. Ghitescu Special Guaranty Account.” Whether or not Mr. Ghitescu specified or knew the title to be given the account is not clear from the stipulation. Although it seems reasonable that the details of the disposition of so large a sum should have been approved by the remitter of the money, it cannot be found on this record that Mr. Ghitescu directed the naming of the account.
9. There were added to the guaranty account, presumably from time to time, the amounts (herein called the “rebates”) of the differences between the list price of the merchandise shipped by Caterpillar to the partnership and the lower actual sales price. Remittances from other sources were also added to the account. The amounts of the rebates as compared with the “other remittances” are not known. Their combined total, by the time war broke out in Europe in 1939, was approximately $167,474.28, which with the $100,000 first deposited, brought the amount in the account to $267,474.28.

War and Freezing

10. On October 9, 1940, the account was with all other Rumanian property blocked as the property of Rumanian foreign nationals under Executive Order 8389, the basic order in the program of freezing of foreign assets. On this, Caterpillar renamed the account, “A. Ghitescu, Blocked Export Dealer Account No. 714.”
11. In 1941 and 1948, in compliance with freezing regulations, the Caterpillar Tractor Co. reported the nature and state of the guaranty account to the Federal Reserve Bank *850 of Chicago as agent for the Treasury. The reports by Caterpillar and by the Federal Reserve Bank, relaying information in Caterpillar’s reports, stated that the guaranty account was the property of Amadeu Ghitescu, whose “Type of Organization” was stated to be “Individual”, and whose “last known (head office) address” was 8 Str. Dumbrava Rosie, in Bucharest.
In answer to the question as to interests of any other person in the property, the report stated:
Mr. N. Butculescu, a citizen of Roumania, residing in Bucuresti, Roumania, might have an interest in this property as he and Mr. Ghitescu work closely together. However, the extent and nature of that interest, if any, are unknown.
12. Caterpillar also had on its books and reported to the Treasury (1) an account in the name of “N. Butculescu Societe en Commandite,” described as a “machinery dealer,” of 116 Galea Victoriei, Bucharest, in which account there were credited spare parts of nominal value and a dealer contract ; and (2) an account in the name of Nicu N. Butculescu, to which there was credited $51,507. Mr. Butculescu was described as an individual, whose address was c/o N. Butculescu Societe en Commandite. In answer to the question as to interests of any other person in the account of Nicu N. Butculescu, Caterpillar stated:
Mr. A. Ghitescu, a citizen of Roumania, residing at 8 Str. Dumbrava Rosie Bucuresti, Roumania, might have an interest in this property as he and Mr. Butculescu work closely together. However, the extent and nature of that interest, if any, are unknown.

Partial Butculescu Uiiblockmg

13. Mr. Butculescu and his wife, Rumanians, who had lived in Rumania before and during World War II, emigrated to the United States in 1948 and became American citizens in 1954.
14. On Mr. Butculescu’s successive applications prior to his death in 1957, the sums of $44,185, $7,322.28 and $1,500, a total of $53,007.28, were successively unblocked by the Treas *851 ury from tbe account described in finding 10, for his use as living expenses and were by license transferred to his personal account or to him directly. On his death the balance in the guaranty account was $214,467.

Program for the Testing of Rumanian Property

15. In 1955 Congress directed, pursuant to the treaties of peace with the satellite enemy countries in World War II, Bulgaria, Hungary and Rumania, that the previously blocked property of the governments and of corporations of those countries should be vested, in the manner of the vesting of German and Japanese assets under the Trading with the Enemy Act, and the proceeds utilized to compensate American citizens for nationalization and war damage connected with those countries. To this end the Act of August 9, 1955, 69 Stat. 562, 22 U.S.C. §§ 1631-1631n (1970), added Title II to the International Claims Settlement Act of 1949. Title II, called herein Public Law 285, relates to Rumanian, Bulgarian, and Hungarian property, but will be described as though it covered Rumanian property only.
16. (a) Section 202(a) of Public Law 285 provided that pursuant to the treaty of peace with Rumania, blocked property in the United States owned directly or indirectly by Rumania or any Rumanian national should vest in the President or his designee, the Office of Alien Property (henceforth, together, “the executive”), and its proceeds covered into the Treasury, there, under other sections, to be paid into a Rumanian Claims Fund and used to pay the claims of U.S. nationals arising from Rumanian nationalization and war-connected damage.
Section 202(a) further provided, however, that property determined by the executive to be “owned directly by a natural person” should not be vested, but should remain in a blocked account in the Treasury, subject to release with other blocked property. If at any time within 1 year from the date of vesting, it should be determined by the executive that the vested property was in fact “directly owned at the date of vesting by a natural person,” it, or if it had been sold, its *852 proceeds, should be divested and restored to blocked status. 22U.S.C. § 1631a(a) (1970).
By § 202(c) a determination that any vested property was “not directly owned by a natural person at the date of vesting” was to be within the sole discretion of the executive and “shall not be subject to review by any court.” 22 U.S.C. § 1631a(e) (1970).
(b) Sections 207 (a) and (b) provided for a suit and an administrative claim, judicially reviewable, for return of vested property. Both remedies were limited to claimants who were not nationals of Rumania under Executive Order 8389. 22 U.S.C. §§ 1631f(a) and (b). The period of limitations for suit or ciaim was 1 year. Section 210, 22 U.S.C. § 1631i (1970).
(c) By § 207 (c), a claim based on “ownership of shares of stock or other proprietary interest in a corporation which was the owner of property at the date of vesting” was to be allowed, in suits or claims under § 207, on certain conditions, if 25 percent or more of the stock or proprietary interest in the corporation was owned by nationals of other than the satellite enemy or enemy countries. 22 U.S.C. §1631f(c) (1970).
(d) Section 208 created machinery for the payment to creditors of the debts owed by the owner of vested property immediately prior to vesting. 22 U.S.C. § 1631g (1970).

Unblocicing of 50 Percent to Mr. Butculescu a/nd His Estate

17. Mr. Butculescu died on January 19,1957, survived by his widow, his sole heir. In July 1958, the widow, as executrix of her husband’s estate, applied for a license unblocking the remainder of the decedent’s claimed half interest in the guaranty account, that is, half the amount of the account at the time of blocking, less the $53,007.28 already released to him.
18. In considering the application, the OAP concluded that (a) the account was the property of a Rumanian partnership, in which each partner had a half interest; (b) the partnership was a legal entity under Rumanian law, and not a “natural person” within the meaning of § 202(a) of Public Law 285 and that therefore its property was not exempt from vesting (finding 16(a)); (c) that, if the account were *853 vested, Mrs. Butculescu could satisfy the title and eligibility requirements of § 207 (c) of Public Law 285 (finding 16 (c)) for the recovery of her husband’s 50 percent interest in the account, and successfully obtain a return of the half interest by proving, in compliance with the section (1) that as an American citizen she was a person other than a national of Rumania under Executive Order 8389; and (2) that she was the successor by inheritance of the owner of the property immediately prior to vesting; or, if she were regarded as not the successor of an individual owner of the property but as basing her claim upon “ownership of shares of stock or other proprietary interest in a corporation which was the owner of property at the date of vesting,” under § 207(c) (finding 16 (c)), then by proving, in compliance with § 207 (c), that 25 percent of the outstanding stock or other proprietary interest was owned at vesting by nationals of countries other than satellite enemy and enemy countries, i.e., Americans.
19* Accordingly, on July 19, 1958, the OAP granted the application for unblocking and unblocked an amount it determined to be Mr. Butculescu’s half interest in the account by issuing a license for the payment of $80,729.86 to Mrs. Butculescu, as executrix. This sum, with the $53,007.28 paid to Mr. Butculescu previously (finding 14), a total of $133,-737.14, constituted half of the guaranty account. In connection with the unblocking, Mrs. Butculescu as executrix released any further claim against the account.

Vesting of the Balance of the Aceov/nt

20. Five days later, on July 24,1958, the OAP by Vesting Order No. SA-260, issued under § 202(a) of Public Law 285, vested the balance of the guaranty account, $133,737.14, and after the deduction of administrative expenses in the amount of $1,337.37, the net proceeds of the account, $132,399.77, were eventually paid into the Rumanian Claims Fund at the Treasury (see finding 16(a)). The order contained determinations that the account was owned by the partnership and not by a natural person, as follows:
1. That the property described as follows:
That certain debt or other obligation of Caterpillar Tractor Co., Peoria, Illinois, evidenced by an ac *854 count payable, identified as Blocked Export Dealer Account No. 714, maintained on its books and records, together with any and all rights to demand, enforce and collect the same,
is property within the United States which was blocked in accordance with Executive Order 8389, as amended, and remained blocked on August 9, 1955, and which is, and as of September 15,1947 was, owned directly or indirectly by N. Butculescu Societe en Commandite, a national of Rumania as defined in said Executive Order 8389, as amended.
2. That the property described herein is not owned directly by a natural person.
21. The other accounts on the books of Caterpillar in the name of the partnership and in the name of Mr. Butculescu (finding 12) were not vested.

Denial of the Ghitescu Claim

22. Amadeu Ghitescu filed no application for divestment of the vested account within the 1-year period following the vesting (see finding 16(a)) and, indeed, no application, claim or suit at any time. He was held in jail by the Rumanian Government from 1952, long prior to the vesting, until his death on August 6, 1961, at the age of 67 from heart disease.
23. In his letter to the House Committee, the Deputy Attorney General stated that Mr. Ghitescu was a political prisoner of the Rumanian Government. In testifying on H.R. 8568, Mr. JaiTe stated that there was no information on why Mr. Ghitescu was imprisoned; that “Mr. Ghitescu was a very wealthy man and he was a capitalist, I am sure. That he was anti-Communist I am willing to accept. I certainly would not dispute it.” See finding 3. It is found that Mr. Ghitescu was imprisoned for political reasons by the Rumanian communist regime.
24. Plaintiffs Viorica Anna Ghitescu and her sons Alexander Ghitescu and Serban George Ghitescu, are respectively the surviving lawful widow of Amadeu Ghitescu and the two children of the marriage. Amadeu Ghitescu died in Rumania a citizen and resident of that country.
*855 25. Under Rumanian law plaintiffs are Mr. Ghitescu’s sole heirs. In a probate proceeding in Rumania, the widow would take %ths and the two children would each take %6ths of his estate.
26. On July 10, 1962, after Amadeu Ghitescu’s death, plaintiffs escaped from Rumania to France, and in February 1963 they applied to the Department of Justice for the divesting of the guaranty account.
27. By letter dated April 3, 1963, the OAP denied the application on two grounds: that it was made too late and on the merits in that the account was not the property of a natural person but was owned by the partnership. OAP did advise plaintiffs to apply to the Studebaker-Packard Motor Car Co., where Mr. Ghitescu had a credit account of some $10,000, stating that if it could be established that Mr. Ghitescu were dead and that plaintiffs were entitled to the money as his heirs, there should be no trouble in obtaining that money. There is no question but that that sum was subsequently paid over to them.
28. From an extract of the minutes of the Tribunal d’Instance of the 17th Arrondissement of Paris, it appears on June 27, 1963, the Presiding Justice of the Tribunal heard the declaration of three persons, who had known the Ghitescu family in Rumania, that Amadeu Ghitescu was married only once; died in prison on August 6, 1961; and “left as heirs, according to French law” his wife, Viorica Anna Ghitescu and two sons of his marriage, in the minutes called Colin Alexander Ghitescu and Serban Georges Ghitescu.

Stipulated Provisions of Rumanian La/w

29. By stipulation in pretrial proceedings the parties agreed, for the purpose of this proceeding, that if experts in Rumanian law were called, they would testify that under the Rumanian Commercial Code, pursuant to which the partnership was formed:
a. The Rumanian Commercial Code went into effect on January 1, 1887.
*856 b. A “Societe en Commandite” under the Eumanian Commercial Code is a limited partnership, the Latin term Societas denoting a partnership in the civil law of Europe.
c. Under Article 83 of the Commercial Code, “Any contribution put into a partnership becomes the property of the partnership if not otherwise stipulated.”
d. The Supreme Court of Eumania ruled in 1925 that under Article 86 of the Code “as 'long as the partnership exists, the associates’ personal creditors cannot attach the contributions put into the partnership because, according to the principle stated in Article 83, these contributions are no longer in the associates’ (private) ownership.” It further ruled that “in any partnership with the exception of joint-stock corporations and partnerships limited by shares, the associates themselves also have only an eventual interest in the partnership assets at the dissolution of the partnership.”
e. Article 86 of the 'Code provides that a business partnership is a legal entity with its own patrimony, distinct from the patrimonies of its associates, composed of the contributions and rights put into the partnership by them, increased by the profits acquired during the business activities. In joining a partnership ian associate relinquishes his ownership right over the contribution.
f. A limited partnership is dissolved as a matter of law at the death of one of its general partners and the surviving partner may not continue its activities unless the partnership agreement stipulates otherwise. (Article 193).
g. In accordance with Articles 199 and 200 of the Commercial Code a legal entity does not disappear through dissolution but, as ruled by decision of the Eumanian Supreme Court in 1942 “During liquidation * * * maintains its legal personality, it's business patrimony, and continues its activi • ties for the purpose of liquidation.”
h. Eules for the liquidation of a Societe en Commandite are prescribed in the Commercial Code.
POST-TRIAL FINDINGS AND CONCLUSIONS

Conditions m Post-War Rumania

30. The communist regime which took power in Eumania following World War II accomplished a virtual confiscation *857 of business property by a combination of laws and decrees. See Foreign Claims Settlement Commission Dec. & Ann. (227-28) (1968). Currency was devalued at the rate of 20,000 old lei to 1 new “stabilized leu.” Foreign assets and claims in foreign currency were required to be reported and transferred to .the national bank, upon which the owners were paid in new Rumanian currency. Industrial enterprises, major and minor, banks, real estate owned by the former propertied classes, property of those absent for any reason for more than a year, and other properties were nationalized and substantially confiscated. In time, substantially all industry and trade, with the exception of the smallest stores and shops, were nationalized. Compensation was nominal, in new currency at the rate of 20,000 to 1, or promised but not made.
31. A cloud was cast on the provisions of the Commercial Code (finding 29) by the new constitution adopted on the institution of the communist regime, which provided that all laws contrary to the constitution were to be of no effect, and by the measures described above. While the institutions and procedures of the Commercial Code were not abolished, the official policy was to replace the concepts of former law with new “socialistic” content. By a combination of the results of this policy and the described nationalization, confiscation and currency decrees, the former law governing matters of private property became little more than an empty shell and courts engaged in enforcing the pre-war procedures of the Commercial Code were severely restricted in their operations.
32. It is a fair inference from the creation and nature of the account and the additions thereto (findings 5-9) that it represented a deposit of moneys outside of Rumania for safekeeping, and was not declared to the communist Rumanian authorities pursuant to the decree requiring declaration of foreign assets (finding 80).

Limitations and Laches

33. (a) Defendant contends that (a) both Amadeu Ghitescu and the plaintiffs failed to comply with the 1-year statute of limitations provided in Public Law 285, and (b) *858 that even if waiver of tlie 1-year limitation is excusable, “the question persists whether waiver of the one year limitation * * * is to be construed as a continuing waiver applicable to the claimants herein * * [1] It also urges that by reason of delay between the plaintiffs’ escape from Rumania to France in July 1962 and the filing of their petition herein, the claim is barred by laches.
(b) Defendant did not plead limitations or laches in its answer herein, nor raise either of those defenses in the course of the three pretrial conferences held following joinder of issue (finding 4). At trial, defendant moved for leave to amend its answer to include such defenses, hut the trial commissioner refused to permit such amendment, on the ground that the effort came too late and would prejudice plaintiffs if belatedly allowed at trial.
(c) Defendant made no effort to obtain a review of that ruling, and it did not make at trial any offer of proof of facts relating to limitations or laches. It then asserted that these issues presented no factual questions, and its presentation to the Review Panel reaffirms that position. Its requested findings of fact and brief to the trial commissioner do not mention laches, and its brief to the Review Panel contains no indication that defendant has been prejudiced in any way by delay on the part of plaintiffs in pressing this matter.
34. Mr. Ghitescu took no action prior to his death with respect to the guaranty account (finding 22). Plaintiffs took no action prior to 1963 to enforce any rights they might have with respect to that account (finding 26). The GAP correctly determined as a matter of law that their 1963 action came too late (finding 27). Accordingly, plaintiffs’ claim is legally barred by limitations.
35. Assuming that Mr. Ghitescu learned in prison of the vesting of the guaranty account, for him to apply for divesting at any time thereafter would have been difficult to the point of impossibility, futile, and dangerous. Had the Rumanian authorities learned of the existence of the foreign asset by reason of such an application, Mr. Ghitescu undoubtedly would have been subject to jeopardy for failure earlier to declare it, and, under the decrees described in finding 30, the *859 Rumanian authorities undoubtedly would have claimed any rights he then had to it. In any event, by applying for divesting from prison, Mr. Ghitescu would have been confirmed to his jailers as a “capitalist”, and as such would have been subject to unwelcome and unpleasant attention. Moreover, like considerations would apply to plaintiffs herein, at least to the time (July 1962) when they escaped from Rumania to France.
36. The failure of Mr. Ghitescu to apply for divesting within the 1-year period following the vesting, and of plaintiffs herein to take any action prior to 1963, are in all the circumstances excusable as a matter of equity and good conscience.
37. Rumanians such as Mr. Ghitescu and plaintiffs herein were afforded no remedy other than an application to the executive, within 1 year after vesting, for a divesting order under § 202. When, in 1963, plaintiffs applied to the OAP for divesting, no remedy, administrative or judicial, in fact existed for them, and their sole hope for obtaining any redress with respect to the guaranty account lay in Congressional relief.
38. Plaintiffs’ claim is addressed to the grace of Congress, and in all the circumstances, including particularly defendant’s failures to plead limitations or laches prior to trial and to suggest, either by way of offer of proof or otherwise, that it has been prejudiced by any delay that has occurred, the time which has elapsed in this case cannot be found to be unreasonable, nor can it fairly be concluded that the claim should be barred either by limitations or by the equitable doctrine of laches.

Proof of Heirship

39. A judicial proceeding was ordinarily necessary, in Rumania, both before and during the post-World War II communist regime, to determine the right of the heirs of a deceased Rumanian to succeed to Ms property.
40. No proof has been presented that such a probate proceeding took place in Rumania with respect to any property of Amadeu GMtescu and it is concluded that no such proceeding took place.
*860 41. The abstract of the minutes before a French court, introduced in evidence, recording declarations that Mrs. Ghitescu and her two sons are the heirs of Amadeu Ghitescu so far as property in France is concerned, is legally insufficient to establish a right to succession to his property in the United States.
42. It is a fair inference from the confiscatory decrees of the Rumanian Government (finding 30) and the long period — 9 years — during which Amadeu Ghitescu was imprisoned prior to his death, that at the time of his death he had no property in Rumania warranting the institution of a probate proceeding.
43. The institution of probate proceedings by plaintiffs in Rumania, if feasible, would have disclosed to the communist regime the existence of foreign assets, with consequences similar to those described in finding 35. Moreover, at least with respect to the asset involved in this reference, it is highly unlikely that such proceedings would have had any real purpose. Plaintiffs’ failure to institute proceedings which might have brought Mr. Ghitescu’s foreign assets, and plaintiffs, to the attention of the Rumanian authorities is, in all the circumstances, both understandable and excusable as a matter of equity and good conscience.
44. Plaintiffs are the sole heirs of Mr. Ghitescu under Rumanian law, and, whatever law might be deemed applicable to the guaranty account, have an equitable right to succession to his interests, if any, to the property involved in this reference, vested by defendant in 1958, paid over into the Rumanian Claims Fund, and thereafter used for governmental purposes. In considering a claim for such property (or its equivalent), Congress has the undoubted power and right to recognize and satisfy such a claim, if founded on considerations of equity and good conscience, without requiring any formal probate decree.
45. In the circumstances of this case, to expect plaintiffs to have instituted probate proceedings in this country is unreasonable. One of Mr. Ghitescu’s two known assets in this country was paid over to them without any necessity for such proceedings, and the only other known “asset” in the United States was the guaranty account, vested by de *861 fendant long prior to plaintiffs’ escape from Rumania, to which, account the OAP had correctly advised them they had no legal rights.
46. To deny plaintiffs any rights they may have to any property of Amadeu Ghitescu on the ground that they failed to institute probate proceedings in Rumania, the United States, or elsewhere, would perpetuate by undue reliance on technicalities any inequity committed by the United States through the exercise of dominion and control over any such property.
47. Plaintiffs’ claim deserves to be considered on its merits (if any), notwithstanding the absence of a formal decree adjudicating them to be heirs of Amadeu Ghitescu.

The Original Ownership of the Guaranty Account

48. The first $100,000 deposited in the guaranty account is agreed to have been the personal property of Amadeu Ghitescu (finding 7). The account and its contents were therefore originally the individual, directly owned property of Amadeu Ghitescu.
49. It is agreed that the balance of the account, approximately $167,000, was composed of deposits of the difference between the billed and actual prices of goods sold to the partnership by Caterpillar Tractor Co., here called rebates, and “remittances from other sources.” The division of this sum between rebates and the other remittances is not known (finding 9).
50. In view of the conclusion (finding 58) that the guaranty account should in any event equitably be regarded as belonging to Mr. Ghitescu and Mr. Butculescu’s successors following the death of Mr. Butculescu in 1957, it is unnecessary to find whether or not it was at any time following the creation of the account in 1934 partnership property or was at all times individually owned property.

The Accou/nt as Partnership Asset

51. Under the Rumanian Commercial Code a limited partnership such as the instant one is a legal entity apart from its partners, with title to its property, which title continues until the partnership is terminated (finding 29). The *862 partnership is not a “natural person” within the meaning of § 202(a) of Public Law 285 (finding 16(a)).
52. The death 'of the general partner in a limited partnership dissolves the partnership but does not terminate its existence, its status as an entity or its title to its assets. Dissolution is ordinarily followed by a period of liquidation, a procedure primarily for the benefit of creditors. On the conclusion of liquidation, the assets are distributed, the partnership is terminated, and the surviving partners and the heirs of the deceased partner take title to their respective shares. See finding 29.
53. No formal legal proceedings to terminate the instant partnership are shown to have taken place following the death of Nicu Butculescu in 1957 or at any other time, and it is found that none took place.
54. Under the Rumanian Commercial Code, liquidation proceedings upon the dissolution of a partnership by the death of a partner are not automatic, but must be initiated, usually by the surviving partner or a creditor.
55. Most businesses in Rumania owned by entities had been confiscated by 1957. See findings 30, 31. Private business partnerships were no longer in existence after the communist regime took over, and there is even some authority that the legal concept of a partnership entity did not exist in communist Rumania. In view of the changes undergone by the courts (finding 31), it is not clear that in 1957 any Rumanian court would have been willing to entertain proceedings of the pre-war, Commercial Code type, to liquidate a pre-war partnership.
56. In the light of the nature of the business of the partnership (finding 5), the departure of Nicu Butculescu to the United States in 1948, the imprisonment of Amadeu Ghitescu continuously from 1952 to his death in 1961, and the legal and economic conditions brought about by the .communist regime, it is concluded that at the time of the death of Mr. Butculescu in America, the partnership had long since ceased to do business, had no assets or creditors in Rumania, and was a dead letter. At least equitably, it should be regarded as having been de facto dissolved and liquidated in 1957 at the latest.
*863 57. In the circumstances, especially the prevailing legal and economic conditions, it is unreasonable to expect those interested to have sought to liquidate the partnership for the sole purpose of passing to the individual partners and their heirs title to any American assets of the partnership. Disclosure of such assets would have created personal danger for those involved, for reasons comparable to those described in finding 35.
58. It is concluded that any title of the partnership to assets in the United States should equitably be regarded as having passed to the individual partners or their successors, in their respective shares, no later than the time of the technical dissolution of the partnership by Mr. Butculescu’s death in 1957, and prior to the vesting in 1958.
ULTIMATE EINDINGS AND CONCLUSIONS
59. Amadeu Ghitescu should equitably be deemed the individual owner of the $133,737.14, vested by Vesting Order No. SA-260 of July 24, 1958, and, after deduction of $1,337.37 for administrative expenses, paid into the Rumanian Claims Fund.
60. While, for several reasons, plaintiffs have no legal claim to the moneys vested in 1958, they as Mr. Ghitescu’s successors in interest have, in equity and good conscience, a meritorious claim to $132,399.77, the proceeds after administrative expenses of the property so vested, and in the circumstances of this case any delay by them in pressing that claim should be excused.
61. The enactment of II.R,. 8568, with amendments as stated in the opinion, is therefore recommended.

 Rule 11(e) expressly provides that review panels are to take the place of the court In requests for review. Rule 11(e) further provides that the Rules of this court that are relevant In those instances where a petitioner Is seeking a review of a commissioner’s decision are also controlling where a claimant is requesting review in a Congressional reference case.

 Defendant’s Brief, p. 4.