Paul CONTI and Conti Corporation
(as owner of F/V Providenza),
Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 01–5068.

United States Court of Appeals,
Federal Circuit.

May 29, 2002.

Paul Antinori, of North Andover, MA, argued or plaintiff-appellant.

Marian E. Sullivan, Trial Attorney, Commercial Litigation Branch, Civil Divi-

sion, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Stuart E. Schiffer, Acting Assistant Attorney General; David M. Cohen, Director; and Deborah A. Bynum, Assistant Director. Of counsel on the brief were Mariam McCall and Deborah Ben–David, Office of the General Counsel, National Oceanic and Atmospheric Administration, Department of Commerce, of Silver Spring, MD.

Before NEWMAN, CLEVENGER, and SCHALL, Circuit Judges.

SCHALL, Circuit Judge.

Paul Conti is a swordfisherman. Along with Conti Corporation, he filed suit in the United States Court of Federal Claims seeking compensation under the taking clause of the Fifth Amendment. In his complaint, Mr. Conti alleged that the government's 1999 prohibition on drift gillnet swordfishing in the Atlantic Swordfish Fishery had deprived him of all economic value in his swordfishing permit, his vessel, the *F/V Providenza* (owned by Conti Corporation), and his swordfishing gear. The Court of Federal Claims granted the government's motion to dismiss the complaint under its Rule 12(b)(4) for failure to state a claim upon which relief could be granted. *Conti v. United States,* 48 Fed. Cl. 532 (2001). The court held that the swordfishing ban did not deprive Mr. Conti of the possession of his vessel and swordfishing gear and thus did not constitute a compensable taking of that property. *Id.* at 537. The court also held that Mr. Conti's swordfishing permit did not give rise to a property interest cognizable under the Fifth Amendment and that it therefore could not be the subject of a taking. *Id.* at 537–38. Mr. Conti now appeals the court's decision.[1] Because we

---

1. Although both Mr. Conti and Conti Corporation were plaintiffs in the Court of Federal

Claims, and although they both have appealed

conclude that the swordfishing ban did not take any of Mr. Conti's property, we affirm.

## BACKGROUND

### I.

The following facts either are undisputed or are taken from Mr. Conti's complaint. Swordfish are caught using drift gillnets, longlines, or handgear. The drift gillnet technique, utilized by Mr. Conti, consists of deploying specially designed nets (pelagic drift gillnets). The nets are attached to a vessel and are deployed to catch swordfish by entangling them.

Mr. Conti began his swordfishing career in the Pacific Ocean in 1979. Complaint of Plaintiffs–Appellants Paul Conti and Conti Corporation (hereinafter "Complaint") at ¶ 3. That year, he acquired and launched the *Providenza*, which was specifically designed for driftnetting. *Id.* Six years later, he moved his base of operations from Seattle, Washington, to Gloucester, Massachusetts, and deployed his vessel and gear off the Atlantic Coast. *Id.* at ¶ 5. Between his arrival in Massachusetts in 1985 and the government's permanent ban on drift gillnets in 1999, Mr. Conti harvested swordfish in the Atlantic Swordfish Fishery using the *Providenza*. According to Mr. Conti, drift gillnet fishing for swordfish accounted for 100% of his income.

### II.

During the period that he fished in the Atlantic Swordfish Fishery, Mr. Conti faced a regulatory regime that increasingly restricted his activities. Pursuant to the 1976 Magnuson–Stevens Act, 16 U.S.C. § 1801 ("MSA") (1994), the Secretary of Commerce possesses the power to regulate fisheries within an Exclusive Economic Zone ("EEZ") that extends from 3 to 200 miles off the United States coast.[2] The Secretary manages the fisheries by approving Fishery Management Plans, which may "prohibit, limit, condition, or require the use of specified types and quantities of fishing gear, fishing vessels, or equipment," 16 U.S.C. § 1853(b)(4) (2000), in order to effectuate the MSA's purpose of preserving the fisheries' health, stability, and fish stocks. *See* 16 U.S.C. § 1853(a)(1)(A) (2000). Regulations implementing Fishery Management Plans, often promulgated by the National Marine Fisheries Service ("NMFS"), have the force and effect of law. *See* 16 U.S.C. §§ 1854– 1855; *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1464 (9th Cir. 1987).

Despite the government's broad *de jure* power to regulate the Atlantic Swordfish Fishery under the MSA, Mr. Conti alleges that he harvested swordfish without *de facto* regulatory interference until 1986, when NMFS enacted regulations which had the effect of requiring him to apply for a revocable, non-transferable permit. *See Atlantic Swordfish Fishery*, 50 Fed.Reg. 33,952, 33,957 (Aug. 22, 1985). Subsequent regulations that were promulgated pursuant to the M.S.A. § and other statutes, including the Atlantic Tunas Convention Act, 16 U.S.C. § 971 (1994), the Marine Mammal Protection Act, 16 U.S.C. § 1361 (1994), and the Endangered Species Act, 16 U.S.C. § 1531 (1994), created an increasingly onerous regulatory environment. Many of these regulations were specifically directed to reducing drift gillnet fishing, which had aroused national and international concern on account of

the court's decision, in this opinion we refer only to Mr. Conti.

**2.** The M.S.A. § defines a fishery as "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics." 16 U.S.C. § 1802(13)(A) (2000).

that fact that drift gillnets ensnare significant numbers of sea turtles and marine mammals, including whales. *See, e.g., Taking of Marine Mammals Incidental to Commercial Fishing Operations; Atlantic Large Whale Take Reduction Plan Regulations,* 62 Fed.Reg. 39,157 (July 22, 1997).

In 1989, the United Nations banned the use of drift gillnets in international waters, which led Congress to enact the Driftnet Act Amendments of 1990. G.A. Res. 225, U.N. GAOR, 44th Sess., 85th plen. mtg., U.N. Doc. A/44/225 (1989); 16 U.S.C. § 1826 (1994). The amendments provided for implementing the international moratorium on the use of drift gillnets of a certain length beyond the EEZ and for the imposition of sanctions against nations whose vessels or nationals were not in compliance. 18 U.S.C. § 1826. In 1991, the government began to implement increasingly severe quotas that limited each fisherman's catch using drift gillnets, *see Atlantic Swordfish Fishery,* 56 Fed.Reg. 65,007 (Dec. 13, 1991), and the NMFS closed the Atlantic Swordfish Fishery entirely from December of 1996 through July of 1998. *See Atlantic Swordfish Fishery; Drift Gillnet Emergency Closure,* 61 Fed. Reg. 64,486 (Dec. 5, 1996); *Atlantic Swordfish Fishery; Extension of Drift Gillnet Emergency Closure,* 62 Fed.Reg. 30,775 (June 5, 1997); *North Atlantic Swordfish Fishery; Closure,* 63 Fed.Reg. 41,205 (Aug. 3, 1998). Finally, in its ongoing effort to reduce bycatch[3] and preserve the swordfish stock, the NMFS issued a final regulation in January of 1999, prohibiting the use of drift gillnet gear entirely in the Atlantic Swordfish Fishery. *Atlantic Swordfish Fishery; Management of Driftnet Gear,* 64 Fed.Reg. 4055 (Jan. 27, 1999); 50 C.F.R. §§ 635.71(a)(17), (e)(8) (2000). The object of the ban was to reduce ma-

rine mammal and sea turtle catch while conserving swordfish and other marine resources. *See* 64 Fed.Reg. at 4055. Since the regulation permitted the harvesting of swordfish in the fishery using methods other than drift gillnet fishing, the NMFS sought to mitigate the ban's economic impact by allowing permit holders, for the first time, to sell permits for use with non-drift gillnet gear. *See* 50 C.F.R. § 635.21(d)(1) (2000).

### III.

In December of 1999, Mr. Conti brought suit in the Court of Federal Claims, alleging that the January 1999 ban on harvesting swordfish using drift gillnets constituted a regulatory taking of his fishing permit, the *Providenza,* and his gillnet gear without just compensation, in violation of the Fifth Amendment. Complaint at ¶ 14. Mr. Conti asserted that the ban had "inversely deprived him of the economically viable use and enjoyment of his property." Complaint at ¶ 12.

In due course, the government moved under RCFC 12(b)(4) to dismiss Mr. Conti's complaint for failure to state a claim upon which relief could be granted. Addressing the motion, the Court of Federal Claims applied the two-part test for regulatory takings claims that is set forth in *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995). That test requires a claimant to establish 1) a compensable property interest that 2) the government took through regulation. After considering the several property interests asserted by Mr. Conti, the court concluded that none of them could form the basis for a viable taking claim. *Conti,* 48 Fed. Cl. at 536 540. The court first considered Mr. Conti's fishing vessel and drift gillnet gear.

---

**3.** "Bycatch" is defined in the M.S.A. § as "fish which are harvested in a fishery, but which are not sold or kept for personal use,

and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2).

While the court acknowledged that Mr. Conti's ownership of the *Providenza* and its gear "has traditional characteristics of personal property," the court concluded that the drift gillnetting ban did not take that property. *Id.* at 536–37. The court reasoned that Mr. Conti's continuing ability "to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses" precluded a finding that a regulatory taking had occurred. *Id.* at 537. As for Mr. Conti's efforts to characterize the right to use the permit and his vessel and gear to earn a living as the relevant property interest taken by the regulation, the Court of Federal Claims determined that continued use of Mr. Conti's property for harvesting swordfish with drift gillnets did not constitute a compensable property interest. Therefore, the court held, the right could not qualify as an interest that could be the subject of a Fifth Amendment taking claim. Finally, in the setting of the pervasive regulatory environment circumscribing Mr. Conti's ability to harvest swordfish using drift gillnets in the Atlantic Swordfish Fishery, the court viewed the interest conferred by the swordfishing permit as resembling a revocable license instead of a compensable property right. *Id.* at 538–39.

## DISCUSSION

### I.

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(3) (2000). When reviewing a dismissal for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4), we "must accept as true all the factual allegations in the complaint and we must indulge all reasonable inferences in favor of the non-movant." *Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001) (citations omitted). The question that the court must answer in reviewing a Rule 12(b)(4) dismissal order is whether the tri-

al court was correct in concluding that the facts asserted in the complaint do not entitle the plaintiff to a legal remedy. *Id.* A trial court should not dismiss a complaint for failure to state a claim unless it is "beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Ponder v. United States,* 117 F.3d 549, 552 (Fed.Cir. 1997) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Whether the Court of Federal Claims properly dismissed a complaint for failure to state a claim under Rule 12(b)(4) is a question of law that we review independently and without deference. *Highland Falls–Fort Montgomery Cent. Sch. Dist. v. United States,* 48 F.3d 1166, 1170 (Fed.Cir.1995).

The Fifth Amendment provides, in pertinent part, as follows: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4. The language of this clause and the jurisprudence interpreting it evince a policy of prohibiting the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that "if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Real property, *see Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 1019, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), tangible property, *see Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), and intangible property, *see Ruckelshaus v.*

*Monsanto Co.*, 467 U.S. 986, 1003–04, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984), all may be the subject of takings claims.

██ As the Court of Federal Claims recognized, this court has developed a two-part test to evaluate claims that a governmental regulation constitutes a taking of private property without just compensation. *See M & J Coal*, 47 F.3d at 1153–54; *Karuk Tribe v. Ammon*, 209 F.3d 1366, 1374 (Fed.Cir.2000). First, a court must evaluate whether the claimant has established a "property interest" for purposes of the Fifth Amendment. *See M & J Coal*, 47 F.3d at 1154. Second, once a court has determined that a property interest exists, it must determine whether a taking occurred. In that regard, we have stated that "it is often important to determine at the outset whether a particular claimed taking was 'categorical' or not." *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1362 (Fed.Cir.2001). A categorical taking has been defined as one in which "all economically viable use, i.e., all economic value has been taken by the regulatory imposition." *Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1357 (Fed.Cir.2000). A categorical taking is distinct from a taking "that is the consequence of a regulatory imposition that prohibits or restricts only some of the use that would otherwise be available to the property owner but leaves the property owner with substantial economic use." *Id.* When a taking is determined to be non-categorical, the court must embark on a fact-based inquiry in which it applies the standard promulgated by the Supreme Court in *Penn Central* to evaluate whether the governmental action at issue constituted a cognizable taking of the property interest at issue. *Rith Energy*, 247 F.3d at 1362. The *Penn Central* analysis involves "several factors that have particular significance." 438 U.S. at 124. Those factors are the character of the governmental action, the economic impact of the action on the claimant, and the extent to which the action has interfered with the claimant's distinct, investment-backed expectations. *Id.* However, if a claimant fails to demonstrate that the interest allegedly taken constituted a property interest under the Fifth Amendment, a court need not even consider whether the government regulation was a taking under the analysis set forth in *Penn Central*. *M & J Coal*, 47 F.3d at 1154; *Karuk Tribe*, 209 F.3d at 1380.

## II.

At the outset, it is important to understand the precise nature of the taking claim that Mr. Conti is asserting. In his complaint, Mr. Conti points to three items of property that allegedly have been taken by the ban on drift gillnet swordfishing: (i) his swordfish permit; (ii) his vessel, the *Providenza;* and (iii) his gillnets and related gear. Mr. Conti acknowledges that these items were not physically taken from him. After the ban on drift gillnets, his permit remained valid for other types of swordfishing, and he maintained possession of the *Providenza* and his gear. Rather, what Mr. Conti alleges in his complaint is that "[b]oth his property and his business have been taken by government regulation, which has inversely deprived him of the economically viable use and enjoyment of his property." Complaint at ¶ 12. Mr. Conti states that he has been economically deprived of the use and value of his vessel, nets, gear, and permit and that he has been forced out of the swordfishing business and left with no alternatives for employment. He explains his predicament in ¶ 7 of his complaint:

> By reason of a combination of unique factors, including but not limited, to Plaintiff's age, his economic limitations, his acquired fishing skills, the relatively small size of the *F/V PROVIDENZA*, the design of the vessel and its gear, the

mesh size and configuration of Plaintiff's nets, the limited permits issued to him by NMFS, the season and location for the harvesting of swordfish, and the average annual days at sea, or Plaintiff's historical fishing effort, and the moratoriums, closures and limits placed by NMFS on other fisheries, Plaintiff cannot transfer or convert either his personal effort or his vessel and gear to any other fishery, and is therefore dependent for his livelihood on the Atlantic swordfish driftnet fishery.

In short, Mr. Conti contends that, while he still is in possession of his permit, the *Providenza*, and his gear, there has been taken from him the ability to use those things in a particular way: to fish for swordfish in the Atlantic Swordfish Fishery using drift gillnets. According to Mr. Conti, because of his unique circumstances, that is the only livelihood that he is capable of pursuing. It is in that respect that he argues his property has been taken. Armed with this understanding of Mr. Conti's taking claim, we turn now to the analysis mandated by *M & J Coal.*

### III.

Our first task under the *M & J Coal* analysis is to determine whether Mr. Conti has established a "property interest" for purposes of the Fifth Amendment. We begin with the swordfishing permit.

■ A. The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment. *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, "existing rules and understandings" and "background principles" derived from an independent source, such as state, federal, or common law, define the dimensions of

the requisite property rights for purposes of establishing a cognizable taking. *Lucas,* 505 U.S. at 1030, 112 S.Ct. 2886.[4] These existing rules often involve and define "the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. Gen. Motors,* 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945).

Applying these principles, courts have held that no property rights are created in permits and licenses. *See, e.g., United States v. Fuller,* 409 U.S. 488, 493, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973); *Alves v. United States,* 133 F.3d 1454, 1457 (Fed.Cir.1998). In *Fuller,* the government condemned 920 acres of the respondents' fee lands. 409 U.S. at 489, 93 S.Ct. 801. The respondents also held grazing permits for certain nearby lands. The permits were issued under the Taylor Grazing Act, 43 U.S.C. § 315. During the condemnation proceeding, the parties disputed whether the "value accruing to the fee lands as a result of their actual or potential use in combination with the Taylor Grazing Act 'permit' lands" was compensable. *Fuller,* 409 U.S. at 489, 93 S.Ct. 801. In addressing the question, the Supreme Court focused on the revocability of the grazing permits and the clear congressional expression in 43 U.S.C. § 315b that the issuance of a permit under the Act "shall not create any right, title, interest, or estate in or to the lands." The Court noted that section 315b makes "clear the congressional intent that no compensable property be created in the permit lands themselves as a result of the permit." *Id.* at 494, 93 S.Ct. 801. Under these circumstances, the Court held that "the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee

4. Though the Supreme Court in *Lucas* considered a property interest protected by state law, this court has recognized that such an interest may also derive from federal law. *See, e.g., Hendler v. United States,* 952 F.2d 1364 (Fed.Cir.1991).

lands in combination with the Government's permit lands." *Id.* at 493, 93 S.Ct. 801. This was the case even if this "element of value" would warrant a higher selling price for the fee lands on the open market than if the fee lands were offered for sale without it.

In *Alves*, we adjudicated a petitioner's claim that his grazing preference, which accorded a priority position for procuring a grazing permit under the Taylor Grazing Act, constituted a property interest compensable under the Fifth Amendment. *See* 43 C.F.R. § 4100.0–5 (1996) (defining a grazing preference). Relying on the Supreme Court's holding in *Fuller* and the similarity and connection between grazing permits and grazing preferences, we held that "neither constitutes a property interest compensable under the Fifth Amendment." *Alves*, 133 F.3d at 1457. Instead, "[w]hat is compensable is the fee interest only, divorced from other governmentally-created rights or privileges appurtenant to the fee." *Id.*

Mr. Conti argues that his swordfishing permit bears no legal resemblance to the grazing permits discussed above, which simply allowed their holders to use property owned by the government. By contrast, Mr. Conti states, the government does not own the fish in the ocean. Mr. Conti's argument is not on point. First, the government has never asserted ownership of the fish in the Atlantic. Rather, pursuant to the regulatory scheme outlined above, the government has broad authority to regulate fishing off the coastline of the United States. *See, e.g.,* 16 U.S.C. § 1801 (1994) (delegating power to the Secretary of Commerce to regulate fisheries within the EEZ that extends from 3 to 200 miles off the United States coast). More importantly, however, Mr. Conti's argument ignores the crucial point that it is his relationship with the asserted permit—not the government's—that deter-

mines whether a property right exists. As the Supreme Court explained in *General Motors*, 323 U.S. at 378, 65 S.Ct. 357, property interests for purposes of the Fifth Amendment flow from "the citizen's relation to the physical thing."

■ Applying traditional notions of property and existing rules and understandings, we conclude that Mr. Conti's swordfishing permit, like the grazing permits in *Fuller* and *Alves*, falls short of conferring a cognizable property interest. As noted above, the Department of Commerce required that Mr. Conti obtain a permit to harvest swordfish in the Atlantic Swordfish Fishery in the exercise of its authority under the MSA. *See* 16 U.S.C. § 1811; *Atlantic Swordfish Fishery*, 50 Fed.Reg. at 33,957. While Mr. Conti could and did utilize his permit to fish for more than a decade, he could not assign, sell, or otherwise transfer the permit. *Atlantic Swordfish Fishery* 50 Fed.Reg. at 33,957. The rights to sell, assign, or otherwise transfer are traditional hallmarks of property. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435–36, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (describing rights to dispose of property and to sell it as part of an individual's bundle of property rights). Further, since the swordfishing permit did not confer exclusive fishing privileges, permit holders like Mr. Conti lacked the authority to exclude others from the Atlantic Swordfish Fishery. *See Dolan v. City of Tigard*, 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994) (the "right to exclude others is 'one of the most essential sticks in the bundle of rights that are commonly characterized as property.' ") (quoting *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979)). In addition, the government at all times retained the right to revoke, suspend, or modify the

permit. *See* 50 C.F.R. § 635.4(a)(3) (2000).[5] Finally, the M.S.A. § itself states that the limited access authorization system "shall not create any right, title, or interest in or to any fish," and that the Department of Commerce may adopt regulations that limit or terminate a particular permit system "without compensation to holders of any limited access system permits." 16 U.S.C. § 1853(d)(3)(D), (d)(2)(A).[6]

The absence of crucial indicia of a property right, coupled with the government's

irrefutable retention of the right to suspend, revoke, or modify Mr. Conti's swordfishing permit, compels the conclusion that the permit bestowed a revocable license, instead of a property right. *See* 50 C.F.R. § 635.4. A contrary holding, as the Supreme Court recognized in *Fuller*, counterintuitively would compensate a claimant for "the value of a right that the Government ... can grant or withhold as it chooses." *Fuller*, 409 U.S. at 493, 93 S.Ct. 801 (quoting *United States v. Rands*, 389 U.S. 121, 125, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967)).[7]

---

5. For all intents and purposes, Mr. Conti is asserting a property interest in the government's discretionary decision not to exercise its explicitly granted authority to revoke, suspend, or modify the permit. We decline to recognize such a property interest. *See Bowen v. Public Agencies Opposed to Social Security Entrapment*, 477 U.S. 41, 55, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (holding that the federal government's exercise of its preexisting statutory right to amend an agreement precluded the existence of a Fifth Amendment property right in a provision of that contract.).

6. Plainly, the MSA's disavowal of the permit's creation of "any right, title, or interest in ... *any* fish," 16 U.S.C. § 1853(d)(3)(D) (emphasis added), is not facially commensurate with a statement that the law does not create any right, title, or interest in the *permit*. However, to the extent that the right to harvest and thus possess fish in the fishery is inextricably tied to the possession of a permit, the language certainly suggests that since the permit does not confer any cognizable property right to harvest fish, the M.S.A. § creates no property right in the permit. In the grazing permit cases, courts interpreting similar language, providing that "a permit ... shall not create any right, title, interest, or estate in or to the lands," 43 U.S.C. § 315b, reached the corollary result that the Taylor Grazing Act created no property interest in the grazing permit. *See, e.g., Alves*, 133 F.3d at 1456.

7. Mr. Conti relies upon *Todd v. United States*, 155 Ct.Cl. 87, 292 F.2d 841 (1961), and *Jackson v. United States*, 122 Ct.Cl. 197, 103 F.Supp. 1019 (1952), for the proposition that

fishermen enjoy property rights in the continued right to fish. *Todd* and *Jackson* do not help Mr. Conti, however. In each case, the plaintiff held a permit that had been issued by the State of Maryland that gave the plaintiff the exclusive right to fish in a specified area of Chesapeake Bay. *Todd*, 292 F.2d at 843; *Jackson*, 103 F.Supp. at 1019–20. In each case, the permit right could be sold or passed by inheritance. *Todd*, 292 F.2d at 843; *Jackson*, 103 F.Supp. at 1020. During World War II, the government severely restricted use of the areas covered by the plaintiffs' permits. The restrictions had the effect of requiring the plaintiffs to cease their fishing activities. In *Jackson*, the court stated that "the plaintiff had a sort of property right in his fishing ground, and ... the Government took that property from him." 103 F.Supp. at 1020. The court held that the plaintiff had an equitable and a legal claim against the government. *Id.* at 1021. In *Todd*, the court held that the plaintiff had an equitable, but not a legal claim against the government. 292 F.2d at 847.

Several considerations make this case different from *Todd* and *Jackson*. First, the terms of Mr. Conti's swordfishing permit distinguishes it from the permits in *Todd* and *Jackson*. Mr. Conti's permit did not give him exclusive control of an area of the swordfish fishery, and it was not devisable at the time the drift gillnet ban went into effect. Moreover, NMFS, which issued the permit to Mr. Conti, retained the authority to alter the manner in which he used the permit. Finally, both *Todd* and *Jackson* were decided before *Fuller*. We do not need to address here whether they remain viable after *Fuller*.

■ B. We turn now to Mr. Conti's claim that the ban on drift gillnet fishing resulted in a taking of the *Providenza*, his gillnets, and related gear. As explained above, the gist of the claim is that there was a taking because, in light of Mr. Conti's unique circumstances, the ban deprived Mr. Conti of the "economically viable use and enjoyment of his property." Complaint at ¶ 12. The Court of Federal Claims rejected the claim. As we have seen, the court recognized that the *Providenza*, the gillnets, and the related gear were property that qualified for Fifth Amendment protection. The court concluded, however, that there had not been a categorical taking of this property because Mr. Conti retained possession of it. The court also concluded that Mr. Conti's ability to put the vessel, gillnets, and gear to other uses precluded a holding that a *Penn Central* regulatory taking had occurred.

Mr. Conti contends that the Court of Federal Claims erred by failing to apply the factors announced in *Penn Central*, as required in a partial takings analysis. According to Mr. Conti, to the extent that the court correctly recognized his property interest in the *Providenza* and its gear, it erred by not drawing inferences in his favor and by improperly rejecting his factual assertions that the drift gillnet ban had rendered his property valueless. Accordingly, Mr. Conti argues that we should vacate the trial court's dismissal under RCFC 12(b)(4) and remand the case for a factual determination as to whether a taking occurred.

As a preliminary matter, we observe that, by citing to *Penn Central*, Mr. Conti appears to recognize that his case does not present a categorical taking. That is because the ban on drift gillnet fishing plainly did not render his vessel and gear valueless, even though Mr. Conti contends that, in view of *his* unique circumstances, his property has been rendered valueless to

him. The question we must answer, then, is whether the Court of Federal Claims erred in dismissing Mr. Conti's complaint under Rule 12(b)(4) without undertaking a *Penn Central* analysis with respect to the vessel, gillnets, and gear. For the reasons that follow, we conclude that the court did not err.

As we have seen, Mr. Conti's taking claim relating to the *Providenza*, his gillnets, and related gear is based on his unique circumstances. This is made clear by ¶ 7 of the complaint, which we have quoted above. In brief, Mr. Conti argues that he could only use the specified property for the harvesting of swordfish in the Atlantic Swordfish Fishery using drift gillnets and that the 1999 ban made that use no longer possible. Hence, there was a taking of his property. We are unable to accept Mr. Conti's argument that the limitation on the use of his property that was imposed by the ban on drift gillnet fishing resulted in a taking of that property. We agree with the Court of Federal Claims that Mr. Conti's continuing ability "to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses," *Conti*, 48 Fed. Cl. at 537, precluded a finding that a regulatory taking had occurred.

Mr. Conti is arguing that a regulatory taking occurred in this case because the 1999 ban on drift gillnet fishing deprived him of a particular use of his property. The law, however, does not recognize a taking in such circumstances. In *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), the Court confronted regulations that were issued by the Department of the Interior pursuant to the Eagle Protection Act, 16 U.S.C. § 668(a), and the Migratory Bird Treaty Act, 16 U.S.C. § 703. The regulations provided that migratory birds and eagles, and their parts, that were lawfully acquired prior to

the effective dates of the statutes could be possessed and transported without a federal permit, but that such birds and their parts could not be purchased, sold, or traded, or offered for purchase, sale, or trade. *See* 50 C.F.R. § 21.2(a) (1978) (promulgated pursuant to the Migratory Bird Treaty Act); 50 C.F.R. § 22.2(a) (1978) (promulgated pursuant to the Eagle Protection Act). The appellees in the case were engaged in the trade of Indian artifacts. A number of the artifacts were partly composed of the feathers of birds protected by the statutes and regulations, and these artifacts existed before the statutory protections came into force. *Andrus,* 444 U.S. at 54, 100 S.Ct. 318. The appellees argued that the prohibition on commercial transactions in pre-existing avian artifacts embodied in the regulations constituted a taking of their property under the Fifth Amendment because the prohibition wholly deprived them of the opportunity to earn a profit from the artifacts. The Supreme Court rejected the claim. In so doing, the Court stated:

> The regulations challenged here do not compel the surrender of the artifacts, and there is no physical invasion or restraint upon them. Rather a significant restriction has been imposed on one means of disposing of the artifacts. But the denial of one traditional property right does not always amount to a taking. At least where an owner possesses a full "bundle" of property rights, the destruction of one "strand" of the bundle is not a taking, because the aggregate must be viewed in its entirety. In this case, it is crucial that appellees retain the rights to possess and transport their property, and to donate or devise the protected birds.

> It is, to be sure, undeniable that the regulations here prevent the most profitable use of appellees' property. Again, however, that is not dispositive. When we review regulation, a reduction in the value of property is not necessarily equated with a taking....

*Id.* at 65–66, 100 S.Ct. 318 (citations omitted). In *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* —— U.S. ——, ——, 122 S.Ct. 1465, 1481, 152 L.Ed.2d 517 (2002), the Court cited *Andrus* in the course of explaining that, in deciding whether a particular governmental action has effected a taking, the Court focuses "both on the character of the action and on the nature and extent of the interference with rights in the parcel as a whole." Citing to *Andrus,* the Court continued: "This requirement that 'the aggregate must be viewed in its entirety' explains why, for example, a regulation that prohibited commercial transactions in eagle feathers, but did not bar other uses or impose any physical invasion or restraint upon them, was not a taking. *Andrus v. Allard,* 444 U.S. 51, 66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979)." *Id.*

*Andrus* compels our rejection of Mr. Conti's claim that the ban on drift gillnet fishing resulted in a taking of the *Providenza* and its gear. We accept as true all of the factual allegations in Mr. Conti's complaint. The problem is that those allegations make out less of a taking claim than the allegations that were advanced in support of the taking claim that was rejected in *Andrus.* Following the ban on drift gillnet fishing, Mr. Conti is in a far better situation vis-a-vis his vessel and its gear than the appellees in *Andrus* were vis-a-vis their artifacts in the wake of the Eagle Protection Act and Migratory Bird Treaty Act regulations. Most importantly, Mr. Conti can offer for sale, and can sell, his property, whereas the appellees in *Andrus* could do neither. We are sympathetic to the situation in which Mr. Conti finds himself following the ban on drift gillnet fishing in the Atlantic Swordfish Fishery. However, as a matter of law, we are un-

able to hold that, on the alleged facts, he has asserted a cognizable taking claim.[8]

## CONCLUSION

For the foregoing reasons, the decision of the Court of Federal Claims dismissing Mr. Conti's regulatory taking claim for failure to state a claim upon which relief could be granted is *AFFIRMED.*

No costs.

---

**8.** It is worth noting that Mr. Conti's taking claim fails for an additional reason. Mr. Conti's ability to use his vessel and gear to catch swordfish using drift gillnets in the Atlantic Swordfish Fishery was dependent upon a permit that was revocable at all times and that, as we have seen, did not constitute a property right for purposes of the Fifth Amendment. In *Mitchell Arms, Inc. v. United States,* 7 F.3d 212, 217 (Fed.Cir.1993), we rejected the claim that the Bureau of Alcohol, Tobacco, and Firearms' decision to revoke a permit allowing the importation and sale of certain firearms constituted a taking of the claimant's right to use the permit for those purposes. We stated: "Mitchell's ability to import the rifles and sell them in the United States was at all times entirely subject to the exercise of ATF's regulatory power. Consequently, any expectation which arose on Mitchell's part as a result of the import permits did not constitute a property right protected by the Fifth Amendment." *Id.* at 217. Likewise, the drift gillnet regulation at issue here has banned a particular use of Mr. Conti's vessel and gear "which was not inherent in its ownership" and was "totally dependent upon the . . . permit issued by" the government. *Id.*