**COLVIN CATTLE CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–1942L.**

United States Court of Federal Claims.

Sept. 2, 2005.

Michael J. Van Zandt, McQuaid Bedford & Van Zandt, LLP, San Francisco, CA, attorney of record for plaintiff. Lyman D. Bedford, of counsel.

Kathleen L. Doster, with whom was Assistant Attorney General Thomas L. Sansonetti, General Litigation Section, Environment and Natural Resources Division, Department of Justice, Washington, DC, for defendant.

## OPINION

WIESE, Judge.

Plaintiff, Colvin Cattle Co., Inc., the owner of 520 acres of land located near the publicly held Montezuma Allotment in central Nevada, sues here for the alleged taking of its water rights and ranching operations as a result of the government's denial of an application to graze cattle on federal lands. Plaintiff additionally asserts a breach of contract arising from the government's cancellation of plaintiff's grazing lease. This case is before the court on defendant's motion to dismiss or, alternatively, for summary judgment on the grounds that plaintiff's water rights do not confer a compensable right to graze on federal lands and that its grazing lease does not create a contractually enforceable right against the government. After hearing oral argument on July 20, 2005, we now rule in defendant's favor and direct the dismissal of plaintiff's claims.

## FACTS

The current dispute arose in February 1995 when plaintiff, a long-time rancher on the Montezuma Allotment, failed to pay $966 in grazing fees to the Bureau of Land Management ("BLM") in connection with its grazing of cattle on publicly held land.[1] As a result of that failure, the BLM issued a notice of trespass on March 15, 1995, for "[g]razing livestock in the Montezuma Allotment without an authorization." Plaintiff in turn challenged the federal government's ownership of the land in question and submitted payment of the grazing fee to the Esmeralda County treasurer under the theory that the state, rather than the federal government, was the legitimate owner of the land. The county promptly returned the check to plaintiff uncashed.

On May 21, 1997, after numerous unsuccessful attempts to settle the trespass claims against plaintiff, the BLM issued a "Proposed Decision Order to Remove and Demand for Payment on the Montezuma Allotment." In response, plaintiff submitted a June 6, 1997, protest in which it continued to challenge the government's ownership of the land. The BLM rejected plaintiff's challenges in a July 24, 1997, "Final Decision," concluding that plaintiff had been "knowingly, and willfully grazing livestock without a grazing authorization." The decision demanded payment in the amount of $37,332.26 for costs and damages associated with plaintiff's unauthorized grazing and provided for the cancellation of plaintiff's grazing lease and the removal of plaintiff's cattle if payment was not made within 15 days. Plaintiff appealed the BLM's decision to the Interior Board of Land Appeals on September 4, 1997, but that appeal was dismissed on November 28, 1997.

After more than three years of additional attempts to remedy the trespass claims against plaintiff, the BLM issued a notice of intent on June 25, 2001, to have plaintiff's cattle removed from the public lands. The following year, on May 1, 2002, in connection with the cancellation of plaintiff's grazing lease, the BLM canceled plaintiff's range improvements permits and ordered plaintiff to remove all materials associated with such improvements within 180 days. Plaintiff did not respond to the cancellation notice and instead filed suit in this court on August 18, 2003. Thereafter, on November 26, 2003, the BLM issued a final trespass decision order-

---

1. The Montezuma Allotment comprises 625,000 acres of public land in Nye and Esmeralda Counties, Nevada, which was reserved for federal use by the Taylor Grazing Act of 1934, 43 U.S.C. §§ 315–315r (2000). Plaintiff first applied to the BLM for a grazing lease on the Montezuma Allotment on September 5, 1969, which was in turn granted on January 19, 1970.

ing plaintiff to remove all range improvements from the public lands. By its terms, however, the order excluded from removal "facilities necessary for exercise of the water rights (e.g. wells) . . . established pursuant to Nevada law."

Although plaintiff is permitted continued access to the water on the Montezuma Allotment, the BLM has since authorized another rancher, Bud Johns, to graze livestock on that same land. As a condition of that authorization, however, Mr. Johns must haul water to the Montezuma Allotment for use by his cattle.

## DISCUSSION

### I.

In determining whether plaintiff has suffered a Fifth Amendment taking,[2] we must begin by examining the nature of plaintiff's asserted property right. *Conti v. United States*, 291 F.3d 1334, 1339 (Fed.Cir.2002). At its core, plaintiff's claim is that a right to the beneficial use of water established under Nevada law carries with it an attendant right to graze cattle on federal land since grazing is the only beneficial use to which the water can be put. *See Buford v. Houtz*, 133 U.S. 320, 322, 10 S.Ct. 305, 33 L.Ed. 618 (1890) (recognizing that due to "the scarcity of water, and the aridity of the climate," land on the public range "can never be subjected to any beneficial use other than the grazing of stock"). Plaintiff maintains that the question of whether it has a right to graze is thus inseparable from the question of whether it has a right to the beneficial use of water, and, in plaintiff's view, "denying the right to use a water right for its legal purpose is the same as destroying that right."

■ The case law makes clear, and plaintiff concedes, that a grazing permit does not rise to the level of a protectable property interest, nor does it confer any right, title, or

interest to the lands of the United States. *Light v. United States*, 220 U.S. 523, 535, 31 S.Ct. 485, 55 L.Ed. 570 (1911) (ruling that the federal government's failure to object to the use of public lands for private grazing "did not confer any vested right on the [users], nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes").[3] According to plaintiff, however, its takings claim is not based on a federal permit or license to graze but rather rests on a state-created water right confirmed by the United States in the Mining Act of 1866, 43 U.S.C. § 661 (2000). Plaintiff argues, in other words, that the right in question was created not by the United States but by the appropriation of water under Nevada law. Once such a vested right exists, plaintiff argues, the United States can extinguish that right only upon the payment of just compensation.

■ Plaintiff's asserted right to graze cattle on public land is essentially predicated on three sources: the Supreme Court's decision in *Buford*, 133 U.S. 320, 10 S.Ct. 305; the state of Nevada's 1925 Stockwatering Act, Nev.Rev.Stat. §§ 533.485–533.510; and the federal Mining Act of 1866, 43 U.S.C. § 661. Plaintiff begins its argument with the Supreme Court's decision in *Buford*. Under its reading of that decision, plaintiff contends that the state of Nevada had the right to define grazing in connection with water rights on public lands prior to the reservation of those lands by the federal government through the enactment of the Taylor Grazing Act of 1934, 43 U.S.C. §§ 315–315r (2000). To the extent the state had in fact regulated or controlled grazing on those lands, plaintiff interprets *Buford* as recognizing a vested property right in the public lands that would remain enforceable against the United States even after that land was later reserved for federal use by the Taylor Grazing Act.

---

**2.** The Fifth Amendment to the United States Constitution provides in relevant part: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V, cl. 4.

**3.** 36 C.F.R. § 222.3 (2005) additionally provides: "(a) Unless otherwise specified by the Chief, For-

est Service, all grazing and livestock use on National Forest System lands and on other lands under Forest Service control must be authorized by a grazing or livestock use permit. (b) Grazing permits and livestock use permits convey no right, title, or interest held by the United States in any lands or resources."

Plaintiff next turns to the 1925 Stockwatering Act, Nev.Rev.Stat. §§ 533.485–533.510, for the state's definition of such a right. That act, plaintiff asserts, recognizes subsisting rights to the beneficial use of water based on a continuous appropriation. *See Hage v. United States,* 51 Fed.Cl. 570, 577 (2002) (recognizing a vested right by appropriation under Nevada law where there exists "the intent to take, accompanied by some open, physical demonstration of the intent, and for some valuable use" including "by watering livestock directly from the source"). Plaintiff additionally maintains that "[t]he right to use water on the public lands and the right to graze under Nevada law are inextricably intertwined" (citing *Itcaina v. Marble,* 56 Nev. 420, 55 P.2d 625 (1936)). *See also In re Calvo,* 50 Nev. 125, 253 P. 671, 676 (1927) (observing that "[t]he right to the use of water for watering live stock in this arid state depends for its value on the public range; hence we think the two matters are properly connected").

While plaintiff concedes that even under *Buford,* a mere statement of the right to graze from the state would be overridden by any future federal reservation because no state statute alone "grants (nor could it grant) a property interest in federal lands that may be enforced against the United States," *Diamond Bar Cattle Co. v. United States,* 168 F.3d 1209, 1214 (10th Cir.1999), plaintiff argues that the validation of prior rights on federal land can nonetheless be accomplished by reliance not only on local law but also on a corresponding act of Congress. In plaintiff's view, Congress passed such an act in the Mining Act of 1866, which expressly defers to the state's local custom and usage:

Whenever, by priority of possession, rights to the use of water for mining, agriculture, manufacturing, or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed . . . .

43 U.S.C. § 661.

As the Supreme Court recognized in *Jennison v. Kirk,* 98 U.S. 453, 457 (1878), the purpose of the Mining Act is to "give the sanction of the United States, the proprietor of the lands, to possessory rights, which had previously rested solely upon the local customs, laws, and decisions of the courts, and to prevent such rights from being lost on a sale of the lands." The *Jennison* Court went on to note:

[W]henever rights to the use of water by priority of possession had become vested, and were recognized by the local customs, laws, and decisions of the courts, the owners and possessors should be protected in them; and that the right of way for ditches and canals incident to such water-rights, being recognized in the same manner, should be "acknowledged and confirmed."

*Id.* at 460.

The confirmation by the Mining Act of vested state water rights—including the right for cattle to consume forage adjacent to water—is, in plaintiff's view, a framework recognized by this court in *Hage v. United States,* 35 Fed.Cl. 147 (1996), where the court observed:

[N]either the Supreme Court, or other lower federal courts, have addressed the scope of the water rights acknowledged by the [Mining Act]. If Nevada law recognized the right to graze cattle near bordering water as part of a vested right before 1907, when Congress created the Toiyabe National Forest, plaintiffs may have a right to forage adjacent to their alleged water rights on the rangeland.

*Id.* at 175. In a later decision, the *Hage* court repeated its "common sense" analysis that "implicit in a vested water right based on putting water to beneficial use for livestock purposes was the appurtenant right for those livestock to graze alongside the water." *Hage v. United States,* 42 Fed.Cl. 249, 251 (1998). In its final decision, the court went on to conclude that although the plaintiffs did not possess a compensable property right in grazing permits on federal lands, they nonetheless owned vested property rights in wa-

ter and were thus entitled to ditch rights-of-way under the Mining Act of 1866. *Hage,* 51 Fed.Cl. at 581.

The creation of vested water rights under state law and the confirmation of those rights under federal law is, in plaintiff's view, a regime that is further recognized by the Taylor Grazing Act, which provides in relevant part:

> [N]othing in this subchapter shall be construed or administered in any way to diminish or impair any right to the possession and use of water for mining, agriculture, manufacture, or other purposes which has heretofore vested or accrued under existing law validly affecting the public lands or which may be hereafter initiated or acquired and maintained in accordance with such law. So far as consistent with the purposes and provisions of this subchapter, grazing privileges recognized and acknowledged shall be adequately safeguarded, but the creation of a grazing district or the issuance of a permit pursuant to the provisions of this subchapter shall not create any right, title, interest, or estate in or to the lands.

43 U.S.C. § 315b. Plaintiff thus argues that the Taylor Grazing Act not only recognizes water rights vested under state law, but also confirms the method of acquiring those rights, specifically by preserving the legal status quo described in *Buford* and acknowledged by the Mining Act of 1866.

## II.

Defendant does not dispute that the right to appropriate water can rise to the level of a compensable property interest. Rather, defendant argues that even if plaintiff in fact possesses such a water right (a contention it

does not address), the use of a public resource is not a "stick in the bundle of property rights," *American Pelagic Fishing Co. v. United States,* 379 F.3d 1363, 1376 (Fed.Cir. 2004), since ownership of a water right does not include an attendant right to graze cattle on federal lands.[4]

Defendant begins its argument with the assertion that title to the lands comprising the Montezuma Allotment was conferred on the United States through the Treaty of Guadalupe Hidalgo in 1848. *United States v. Nye County,* 920 F.Supp. 1108, 1110 (D.Nev. 1996) ("On February 2, 1848, following the Mexican American War and pursuant to the Treaty of Guadalupe Hidalgo, ... Mexico ceded lands, including the area comprising present day Nevada, to the United States."). Subsequent grazing on these public lands, defendant continues, was done at the sufferance of the federal government and did not confer on private parties any vested right in the land. *Light,* 220 U.S. at 535, 31 S.Ct. 485. Further, defendant asserts, the Property Clause of the United States Constitution gives Congress the power over federal lands "to control their occupancy and use, to protect them from trespass and injury and to prescribe the conditions upon which others may obtain rights in them." *Utah Power & Light Co. v. United States,* 243 U.S. 389, 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917).

Given this history, defendant argues that any grazing that occurred on the Montezuma Allotment prior to the enactment of the Taylor Grazing Act of 1934 was done at the federal government's sufferance and not at the state's, and therefore the grazing could continue only so long as the United States (and not the state of Nevada, as plaintiff contends) did not cancel its "tacit consent." *Light,* 220 U.S. at 535, 31 S.Ct. 485.

---

**4.** Defendant also claims that plaintiff has not made an effort to transport the water from the public property or sought permission from the BLM to put the water to any alternate use, thus rendering any claim as to a taking of the water itself unripe. *See Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 186, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) (finding that a takings claim is not ripe until "the government entity charged with implementing the [challenged] regulations has reached a final decision regarding the appli-

cation of the regulations to the property at issue"). Plaintiff argues, however, that the very act of revoking a grazing permit renders a stock-watering right worthless, so that plaintiff need not have attempted to transport the water elsewhere in order for its claim to have come due. We believe that plaintiff's claim is indeed ripe because, at bottom, it is an action involving the government's authority to prohibit grazing on public lands—a matter on which a final administrative decision has been reached.

In *Light,* the Supreme Court indeed held that the United States "can prohibit absolutely or fix the terms on which its property may be used." *Id.* at 536, 31 S.Ct. 485. In reaching this result, the Court observed:

> [W]ithout passing a statute, or taking any affirmative action on the subject, the United States suffered its public domain to be used for [the pasturing of livestock]. There thus grew up a sort of implied license that these lands, thus left open, might be used so long as the government did not cancel its tacit consent. Its failure to object, however, did not confer any vested right on the complainant, nor did it deprive the United States of the power of recalling any implied license under which the land had been used for private purposes.

*Id.* at 535, 31 S.Ct. 485 (citation omitted).

We do not believe, as plaintiff suggests, that the ownership and control by the United States of public lands is altered by the Supreme Court's decision in *Buford.* Although plaintiff reads *Buford* as recognizing a vested property right in public lands created under state law, a long line of Supreme Court precedent, like *Light,* 220 U.S. at 535, 31 S.Ct. 485, confirms that silence or inaction by the federal government regarding grazing on public lands does not create the property right plaintiff now claims. *See also United States v. Holliday,* 24 F.Supp. 112, 114 (D.Mont.1938) ("Subsequent authorities have unquestionably modified the doctrine of implied license [as recognized in *Buford*], holding the possession thus permitted is by no means irrevocable, and that failure to object did not confer any vested rights nor deprive the government of the power to recall any implied license under which the land had been used by private individuals."). In addition, the case law is equally clear that the "use of public lands for grazing is not a right but a privilege." *Diamond Bar Cattle,* 168 F.3d at 1212. Thus, plaintiff can find no support for the proposition that the right to use public land before that land was reserved for federal use by the Taylor Grazing Act can be enforced against the United States as the equivalent of a property right of ownership. *Itcaina,* 55 P.2d at 629–30 (holding that while

"in the absence of government regulations, the state may regulate the use of the unreserved and unappropriated public domain ... [n]o property right can be acquired by such use").

Even if *Buford* could be construed as acknowledging such a right, however, we do not believe that the state of Nevada ever conferred on plaintiff the right to graze on federal lands in the first instance. Plaintiff traces its water rights to Nevada's 1925 Stockwatering Act, Nev.Rev.Stat. §§ 533.485–533.510, and three cases it believes link the right to graze with a vested stockwatering right. *See Itcaina,* 55 P.2d 625; *Ansolabehere v. Laborde,* 73 Nev. 93, 310 P.2d 842 (1957); *In re Calvo,* 50 Nev. 125, 253 P. 671. But while the Nevada Supreme Court has indeed recognized a connection between a stockwatering right and the ability to graze (*i.e.,* that the use of a stockwatering right may be dependent for its value on an adjacent public range, *In re Calvo,* 253 P. at 672), the court has additionally ruled that the state of Nevada did not intend to create any right or title to public lands in passing the 1925 Stockwatering Act:

> The state [of Nevada] is not asserting any right or title to the public domain under [the 1925 Stockwatering Act]. All that the state seeks to do pursuant to the [Act] is to exercise police regulations over the public domain.... Furthermore any time the federal government ... in any ... manner undertakes to exercise control over [the public domain], the [Act] becomes inoperative in so far as it conflicts with the authority of the federal government.

*Id.* at 675. Similarly, in *Itcaina,* the Nevada Supreme Court held:

> No property right can be acquired by [grazing livestock upon the public domain]. All persons so using the public domain do it merely by sufferance of the federal government or, as it is sometimes designated by the courts, by virtue of an implied license. This use is often alluded to as a right. It is not a right that the government of the United States has conferred, and these public range lands may at any time be withdrawn from such use ....

55 P.2d at 629–30; *see also Ansolabehere,* 310 P.2d at 845 (recognizing that portions of Nevada's water laws were superceded by the Taylor Grazing Act). Thus, while the state had the authority to regulate the use of federal lands, it did not have the power to alter their ownership.

In addition, the Ninth and Tenth Circuits have expressly rejected the assertion that a right to graze on federal lands is attendant to a state water right. In *Hunter v. United States,* 388 F.2d 148 (9th Cir.1967), for example, the United States sought an injunction to prevent the grazing and watering of cattle within the boundary of a national monument. In response, the plaintiff argued that the "taking and use of the water constituted an appropriation vesting in his predecessors a water right, together with an appurtenant right of way to graze cattle, which rights the general government was bound to honor under the provisions of the [Mining] Act of 1866." *Id.* at 151. As to the water right, the court concluded that "a legal basis for the acquisition of an appropriation to water by virtue of local decisions has been established" and that such a "grant of the use of waters from the federal government ... is entitled to protection." *Id.* at 153. As to the alleged grazing right, however, the court observed:

> Whether this "grant" carried with it an easement to graze is a question readily answered. Hunter's contention is based upon the well-settled rule that the grant of a right in real property includes all incidentals possessed by the grantee and without which the property granted cannot be fully enjoyed. He urges that the adjoining lands provide the means to use the water beneficially and must therefore be deemed appurtenant to it. He claims too much. The appurtenance must be limited to that which is essential to the use of the right

granted; it does not include the thing with which the right granted is used.

*Id.* at 153–54. *Accord Gardner v. Stager,* 892 F.Supp. 1301, 1303–04 (D.Nev.1995), *aff'd,* 103 F.3d 886 (9th Cir.1996) (finding that the plaintiffs' argument that their predecessors acquired vested water rights to which grazing rights were appurtenant was "expressly rejected long ago" (citing *Hunter,* 388 F.2d at 153–55)).

Similarly, in *Diamond Bar Cattle,* 168 F.3d 1209, the holders of expired permits to graze cattle on public lands sought a declaratory judgement from the court that their water rights acquired under New Mexico law included an inseparable right to graze the land. In rejecting the plaintiffs' argument that a vested water right included a right to graze public lands, the Tenth Circuit observed that "[a]ny grazing of cattle on public lands by plaintiffs' predecessors was permitted by an implied license, which is merely a 'personal privilege to do some particular act or series of acts on land without possessing any estate or interest therein, and is ordinarily revocable at the will of the licensor.'" *Id.* at 1212. The court went on to note that while various state statutes may have purported "to grant possessory interests in public domain lands that may be enforceable against non-federal claimants, no New Mexico statute grants (nor could it grant) a property interest in federal lands that may be enforced against the United States." *Id.* at 1214.[5]

Nor does the Mining Act of 1866 either confer or confirm any grazing right on federal lands. In *Jennison,* 98 U.S. at 460, the Supreme Court construed section 9 of the Mining Act as recognizing only two possessory rights: the right to use water on public lands for "mining, manufacturing, or other beneficial purposes, acquired by priority of possession, when recognized by the local cus-

---

**5.** Plaintiff attempts to distinguish *Hunter, Gardner,* and *Diamond Bar Cattle* on the ground that the plaintiffs in those cases claimed a right to graze "immune from federal pasturage," whereas in the instant case plaintiff neither claims a right to exclusive possession nor pursues a declaratory judgment but instead seeks the compensation it claims it is owed when the federal government creates physical barriers to its appropriation of water or regulates into extinction

its vested right to water and grazing. Although the procedural postures of these cases may differ from our own, the interests claimed are identical. *See, e.g., Diamond Bar Cattle,* 168 F.3d at 1213 (describing the plaintiffs' interest as a vested water right that "allegedly entitled plaintiffs' predecessors, and now entitles them, to an inseparable but distinct right to use for grazing, without a permit, the [federal] rangeland").

toms, laws, and decisions of the courts"; and "the right of way for the construction of ditches and canals to carry water for those purposes." No other possessory right—specifically the right to graze—was recognized by the Mining Act. *See Diamond Bar Cattle,* 168 F.3d at 1215 (concluding that the Mining Act "cannot fairly be read to recognize private property rights in federal lands, regardless of whether proffered as a distinct right or as an inseparable component of a water right").

We must likewise reject plaintiff's contention that its position finds support in *Hage,* 35 Fed.Cl. at 175. In addition to being the only court to find a right to graze in connection with the Mining Act, the *Hage* court explicitly concluded that the Mining Act "does not address property rights in the public lands and the court declines to create such rights contrary to the clear legislative intention of Congress." *Id.* at 170. Further, the *Hage* court did not find that the plaintiffs' water right included a right to graze on land adjacent to the water (as plaintiff here claims for itself) but instead found a very limited right to graze cattle within 50 feet on each side of an established Mining Act ditch right-of-way. 42 Fed.Cl. at 251.[6] *See, e.g., Diamond Bar Cattle,* 168 F.3d at 1216–17 (distinguishing between the right asserted in *Hage*—"to forage only along the waterfront or a right to lead ... cattle to water solely to drink"—and the broader claim of a right to "occupy and possess, without federal authorization ... federal land for cattle grazing purposes"). Finally, the *Hage* court was concerned with limiting the plaintiffs' access to water, a consideration not at issue here.[7] In the words of the *Diamond Bar Cattle* court, the United States in the instant case "has not acted to take plaintiffs' water rights, has not denied access to the water, and has not sought to divert plaintiffs' use to a governmental purpose." *Id.* at 1217. Because

plaintiff has failed to establish a compensable property right to graze cattle on the Montezuma Allotment, its takings claims must be rejected.

### III.

Plaintiff additionally claims that the government had an obligation to prevent both Bud Johns's cattle and wild horses from infringing upon plaintiff's water rights. Although plaintiff acknowledges that both the Supreme Court and this court have characterized intrusions by wildlife as outside the control of the government and thus not instrumentalities of a taking (*see, e.g., Kleppe v. New Mexico,* 426 U.S. 529, 535–36, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976); *Bradshaw v. United States,* 47 Fed.Cl. 549, 554 (2000)), plaintiff maintains that its case is distinguishable because wild horses have *permanently* occupied the area designated under its grazing lease. Plaintiff fails to explain, however, why such a distinction removes its claim from the purview of *Kleppe* and *Bradshaw.*

As to Bud Johns's cattle, the United States cannot be held responsible for the incursion of water rights by a private party. *Alves v. United States,* 133 F.3d 1454, 1458 (Fed.Cir. 1998) ("There clearly can be no taking when whatever acts complained of are those of private parties, not the government."). It is worthy of note, however, that Bud Johns's grazing authorization specifies that he must provide his own water for his cattle. Accordingly, plaintiff's allegations regarding intrusions on its water rights by third parties must also be rejected.

### IV.

■ In addition to the taking of its water rights, plaintiff also alleges the taking of its ranch under the theory that cattle ranching is the only economically viable use for the property—a use made untenable by the loss of its watering and grazing rights. We do

---

**6.** Notably the *Hage* court did not address the question of whether the claimed water right was a compensable property interest or whether the plaintiffs could have used the water if the government had not deprived them of access, leaving those inquiries for a later proceeding.

**7.** The *Hage* court observed that "[a]t most, [the plaintiffs] may have a right to go on to the land

to access the water in which they have a vested right." 51 Fed.Cl. at 591. The court reasoned that "[t]he government cannot cancel a grazing permit and then prohibit the plaintiffs from accessing the water to redirect it to another place of valid beneficial use. The plaintiffs have a right to go onto the land and divert the water." *Id.* at 584.

not believe, however, that any decrease in the value of plaintiff's ranch due to a change in plaintiff's use of the Montezuma Allotment results in a compensable taking. *See United States v. Fuller,* 409 U.S. 488, 493, 93 S.Ct. 801, 35 L.Ed.2d 16 (1973) (holding that "the Fifth Amendment does not require the Government to pay for that element of value based on the use of respondents' fee lands in combination with the Government's permit lands"). This is particularly true where, as here, plaintiff is found to have no compensable grazing right and has made no showing that it has been deprived of any water right. *See Diamond Bar Cattle,* 168 F.3d at 1217 ("Plaintiffs contend their water right is of little utility if their cattle have no place to graze. If true, the fault lies with plaintiffs, who were fully apprized of the consequences of failing to renew their permits."); *Hage,* 35 Fed.Cl. at 171 (recognizing that a ranch may be rendered worthless in the absence of a grazing permit, but noting that "plaintiffs' investment-backed expectations and reliance on the privilege to graze do not, in themselves, create a property interest in the rangeland or the permit").

## V.

 In addition to its takings claims, plaintiff asserts a breach of contract claim and a claim arising under the Federal Land Policy and Management Act of 1976, 43 U.S.C. § 1752(g) (2000).[8] As to plaintiff's breach of contract claim, the case law is clear that "as a matter of law the [grazing] permit does not create a contract between the parties." *Hage,* 35 Fed.Cl. at 166.[9] As to its section 1752(g) claim, plaintiff argues that defendant has reduced the total number of cattle allowed to graze on the Montezuma

Allotment, thereby rededicating the range in whole or in part to a use other than grazing and thus entitling plaintiff to compensation for its leasehold interest. Plaintiff additionally argues that there is no administrative prerequisite to filing a claim under section 1752(g).

In defendant's view, section 1752(g) is inapplicable here because plaintiff's lease was not canceled in order to devote the lands to another public purpose. Even if section 1752(g) were applicable, however, defendant argues that plaintiff's section 1752(g) claim is unripe because plaintiff has not exhausted its administrative remedies, specifically by applying to the "Secretary concerned" for plaintiff's "interest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease, but not to exceed the fair market value of the terminated portion of the permittee's or lessee's interest therein." 43 U.S.C. § 1752(g).

Because it is undisputed that another rancher is now using the lands in question to graze his cattle, the court is unable to conclude that the lands have been devoted to another public purpose as is required by the terms of the statute. Plaintiff's section 1752(g) claim therefore must fail.

## CONCLUSION

For the reasons set forth above, defendant's motion to dismiss plaintiff's complaint is granted and the Clerk is directed to enter judgment accordingly. No costs.

---

**8.** 43 U.S.C. § 1752(g) provides:

Whenever a permit or lease for grazing domestic livestock is canceled in whole or in part, in order to devote the lands covered by the permit or lease to another public purpose, including disposal, the permittee or lessee shall receive from the United States a reasonable compensation for the adjusted value, to be determined by the Secretary concerned, of his interest in authorized permanent improvements placed or constructed by the permittee or lessee on lands covered by such permit or lease, but not to exceed the fair market value of the terminated portion of the permittee's or lessee's interest therein.

**9.** Plaintiff relies on *United States v. Certain Parcels of Land,* 296 F.Supp. 774, 775 (C.D.Cal. 1969), for the proposition that a grazing *permit* under 43 U.S.C. § 315b is distinguishable from a grazing *lease* under 43 U.S.C. § 315m. In plaintiff's view, the former by its terms confers no "right, title, interest, or estate in and to the lands" of the United States, *id.,* while the latter contains no such limitation. The difference in terminology, however, merely relates to the location of the land within or outside an established grazing district. 43 C.F.R. § 4100.0–5 (2005).